## W. H. FRIZZELL V. THE STATE.

*No. 7335.    Decided June 20.*

1.  **Change of Venue.**—By article 576 of the Code of Criminal Procedure the district judge is authorized, where he is satisfied that a fair and impartial trial can not be had in the county where the case is pending, upon his own motion, to change the venue to any county in his own or in an adjoining district.

2.  **Same—Nearest County.**— It is only where the change of venue is granted upon the application of the State or the defendant that the change is required to be made to the county that is nearest to the county of the prosecution.  Where the change is made upon the court's own motion the case may be sent to any county in the same or in an adjoining district; and the exercise of this discretion will not be revised on appeal unless it be shown that the defendant has been materially prejudiced thereby.

3.  **Same—Second Change.**—Where the venue has been changed upon the court's motion the defendant may have it again changed upon showing the existence of any of the statutory grounds which would have entitled him to a change in the first instance.

4.  **Continuance—New Trial.**—It is only in a case where, from the evidence adduced on the trial, the appellate court is impressed with the conviction not merely that the defendant might probably have been prejudiced in his rights by a refusal of his application for a continuance for the want of absent testimony, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted, that a conviction will be set aside because of the refusal of a continuance.

5.  **Evidence—Antecedent Threats.**—Antecedent threats made by the defendant against the injured person are always admissible against the defendant charged with murder, to prove express malice.

6.  **Same—Clothing of Deceased.**—Over the objection of the defendant the State was permitted to put in evidence before the jury the clothing worn by the deceased at the time she was killed, and to exhibit the shot holes in such clothing to the jury. *Held*, that the evidence was admissible.

7.  **Argument of Counsel.**—Remarks made by counsel for the State in argument to the jury will not constitute reversible error unless they were of a character calculated to improperly affect the defendant's rights.

8.  **Insanity—Charge of the Court.**—See the statement of the case for a charge upon the issue of insanity held to be correct and sufficient, wherefore it was not error to refuse to give special instruction requested by the defendant upon said issue.

9.  **Reasonable Doubt—Charge of the Court.**—When the jury is instructed as to the rule of reasonable doubt, the rule being made applicable to the whole case, it is not reversible error, in the absence of instructions upon the subject requested by the

defendant, that the charge omits to apply the rule of reasonable doubt specially as between the degrees of homicide.

**10. Murder in the First Degree—Insanity—Evidence.**—See the statement of the case for evidence *held* sufficient to sustain a conviction of murder in the first degree, and insufficient to establish the defense of insanity.

APPEAL from the District Court of Taylor, on change of venue from Comanche.  Tried below before Hon. T. H. Conner.

The conviction is of murder in the first degree, with the punishment assessed at death.

The opinion discloses the facts relating to the change of venue, and the following is the evidence in full adduced on the trial:

Jasper Sullivan testified for the State:  I know the defendant.  Saw him in Comanche the night before the killing.  He had a long talk with me about his wife; said he was looking for her, and he thought she was at Brownwood.  I informed him she was in Comanche, and lived in a tent near the railway.  He asked me to go and see his wife for him.  Told me to tell her he had seen me in Dallas, and that I asked if she still had that little pistol he gave her at Granbury, and that he had one just like it.  Then told me not to tell her that, as it might scare her.  He told me to ask his wife if she wanted to see him.  I went to the tent, but defendant's wife cut me very short, and replied that she did not wish to see defendant.  I came back and informed defendant, and he asked me to show him the tent.  On the way we went into the saloon and took a drink.  We met a sister of defendant's wife.  Defendant said it was his wife's sister, and avoided her.  I showed defendant the tent, and remained about three minutes about fifty feet away, and then went back up town about three hundred yards and was sitting down at a lunch stand to eat my breakfast when I saw the crowd rushing by on the street going down to the tent.

Cross-examined:  I did not hear the shooting.  We talked till about 11 o'clock and went to bed.  Defendant spoke of his wife frequently in the conversation.  He appeared gloomy and dejected.  It was my opinion from defendant's actions that he had come to live with his wife; said he loved his wife.  When I told him his wife did not want to see him he looked "hacked," and I said "Let's get a drink," and I paid for the drinks.  Don't think defendant took but one drink.  He appeared to be a weak-minded man, but I think he was a sane man.  I saw nothing indicating that he was insane.

W. B. Brodie testified for the State:  I was at Mr. Shortridge's gate when the first shot was fired.  I was about one hundred yards from the tent and seventy-five yards from the depot.  I heard a pistol shot but could not see it, but saw a woman running and a man pursuing.  I saw him shoot her in the back the third shot, and then in the side while she was on her knees with her hands up.  She then fell and he walked

to the front and shot her in the breast the fifth time, and then snapped the pistol in her face. I ran to the spot and met the man about twenty feet from the woman. I was the first one to get to him. The defendant did the shooting. Defendant said he had cried and cried over that woman night after night and she refused to receive a letter from him. I asked the defendant to give me the pistol, but he said he would not, but he would give it to the sheriff. I was very much excited. Defendant was not excited; appeared calm and deliberate, and was in my judgment a sane man. The killing was in Comanche County, January 24, 1891.

Cross-examined: I did not see Mr. Campbell when I met the defendant. When I last saw him he was standing on the railway platform about the time the first shot was fired. The deceased fell about eighty feet from the tent and thirty feet from the railway track. The shooting occurred about 8 or 9 o'clock in the morning. Defendant did not attempt to escape. It was in a thickly settled part of the town. There were houses in every direction within a few hundred feet of the place of the killing. There were several men at the depot and lumber yard.

J. D. Campbell testified for the State: I was at the depot on the platform when I heard a shot and a scream. Saw a man pursuing a woman and he shot her in the back at the second shot. He ran up near and reached close to her and shot her in the back again, and she fell to her knees and held up her hands and begged for mercy, and he shot her again and then walked in front and shot her in the breast. I then said to some men, "Let's catch him," and I went for a gun but failed to get it, and reached defendant a short distance from the place of the killing. In answer to me he said he shot her because she had betrayed three men; that she should never live to betray another. He asked me if he had killed her. I told him I did not think his wife was dead and he said he was sorry of it, and that if he had had another cartridge he would have shot her again. I asked him for the pistol, but he refused and said he would give it to the sheriff, and if the people of Comanche would do right by him he would do right by them. I went with him up town in company with two others, and he handed his pistol to the sheriff and gave up. He did not attempt to escape. Defendant was calm and deliberate and was free from excitement. I have had some experience with insane persons and I regard the defendant as a sane man. The defendant here in court was the man who did the shooting. All this happened in Comanche County, Texas, January 24, 1891.

Cross-examined: I was very much excited. I formed my opinion at the time I was with the defendant. I formed my opinion after considering his manners and actions. I never studied any work on insanity. I have very little education. Have been in the mercantile business

for fifteen years in the city of Comanche. I was the first man to reach the defendant after he left the place of the killing. I did not see Mr. Brodie when I went up to defendant. No one talked to defendant but myself while going up town. Witness said he had had very little to do with insane people. Never saw defendant before.

Mrs. Dugler testified for the State: I live in Comanche, and one hundred feet southwest of the tent in which deceased lived. I heard a shot and looked up and saw Mrs. A. A. Frizzell running and a man after her. He shot her twice in the back and once in the arm and once in the breast. At the fourth shot Mrs. Frizzell was on her knees crying have mercy. I ran to her and all she said was, "Mother, I am killed."

Cross-examined: I did not see Mr. Brodie. I saw Mr. Campbell. Mrs. Frizzell lived only a few minutes after we got her in the tent.

Miss Willie Hughes testified for the State: I was on the platform at the depot when I heard a shot and a woman scream. I turned and saw a man running after a woman, firing rapidly. The woman fell to her knees and raised her hand and cried have mercy, and he shot her twice again. Mrs. Brown asked me to go after the doctor, and I ran and got Dr. Jack. There was a little boy 13 years old in the tent.

Mrs. M. E. Brown testified for the State: Deceased was my daughter. She married defendant the 9th of February, 1890, and lived at my house until he and Annie separated. Defendant came to our tent about 9 o'clock in the morning, January 24, 1891. He raised the flap of the tent and said "Good morning." No one answered except my son, 13 years old. There were in the tent myself, little boy, and my daughter Annie, the deceased. I said, "Go away; we don't want you." Defendant said, "Annie, ain't you going to speak to me?" She said, "I haven't any talk for you; you have come here to disgrace and ruin me, as you have done elsewhere. What did you come here for?" He said, "I never did you any harm." She replied, "Then you are awfully belied upon." Defendant then handed deceased a letter, and she read it and returned it with the remark, "I don't see how you can help yourself." Deceased then left the tent. Defendant then followed her, and in a few minutes I heard a shot and a scream. Defendant ran after her and shot her four times more. While down on her knees she said, "For God's sake, Mr. Frizzell, don't shoot any more," and defendant then shot her in the breast the fifth time and snapped the pistol in her face. The last words deceased said were, "Ma, I am killed; send for the doctor."

Cross-examined: When defendant came in the tent his whiskers were about three weeks old and were blacked and disguised. Defendant and deceased were separated about seven months after marriage, 16th September, 1890. He came back to her two or three times and remained a day or two each time. We lived at Granbury about August

1, 1890. Jim Hastings lived in a tent about three hundred yards away. About August 1, 1890, at night, defendant raised a fuss at our house. We were afraid of him and sent for Mr. Hastings. He was not crazy. He had his open knife in his hand, but did not use it. It was the "Old Nick" in him. Jim Parsons, Mrs. Rhoda Parsons, Josiah Montgomery, and Mrs. Martin were there on a visit. Defendant ate supper with the rest of the family. He afterward pretended he had not eaten, and about 11 o'clock I cooked him some supper and he ate again. I never told Jim Hastings defendant was going crazy that night. I sent for Jim Hastings and said defendant was acting queer. I had no bad feelings for defendant. I did advise deceased to leave defendant if he did not provide for her. Mrs. Brown identified the corset and sacque which deceased wore when killed, and they were admitted in evidence.

Re-examined by the State: Defendant was in my opinion sane at the time of the killing. Since I have known him I have never seen anything to the contrary.

Dr. Jack testified for the State: My opinion is that deceased came to her death from the effects of five pistol shots—one in the back near the spine, one in the right side of the back, one in the left side, one in the left arm, one in the fleshy part of the breast. The wound in the arm was above the elbow and behind. The shot in the breast went in from the front.

Mr. J. C. Hughes testified for the State: I was on the platform at the depot about seventy yards from the tent when I heard a shot and scream, and I saw a woman turning away from a man who was in a few feet of her. When I first saw them they were facing each other. I saw them before they moved. Defendant shot rapidly. Shot deceased five times. Shot her when she was on her knees begging for mercy.

Professor Rogers testified for the State: I was about two hundred feet away—northeast across the railway. I heard a shot and in a few moments saw a man pursuing a woman and very near her. Saw him shoot three times. He would stop before shooting and steady his arm. Shots were about a half minute apart. Mr. Campbell and Mr. Brodie were with defendant when he went up toward town.

Mr. Virg Hamilton testified for the State: I saw only three shots. I was at the roller mills. The woman fell at the second shot. Defendant walked to the front and shot her again and then snapped his pistol. Heard the woman screaming while the shooting was going on.

Mr. R. B. True testified for the State: I was at the roller mills when the shooting occurred. I saw the last shot. Defendant was pointing his pistol toward the north. Deceased was down at the last shot. I do not know who was the first man to where the woman was killed.

W. H. Martin testified for the State: I live in Somervell County. I married defendant's sister Rhoda about three years ago. I am on tolerably good terms with defendant. He and wife A. A. Frizzell were

at my house about the 1st of August, 1890. They were living together at the time. I was out at the lot one morning, and I asked defendant what was the matter with him and his wife. Defendant replied that "If his wife would not live with him she should not live with any other man." I am acquainted with defendant's father and family. I never heard of there being any insanity in defendant's family, and I never heard of anything being wrong with defendant. Defendant has been around my house "right smart." I think he is of sound mind. I was up at Mrs. Brown's at Granbury about August 1, 1890. Never heard her say that defendant was crazy at that time and place and tried to kill himself. Defendant seemed to love his wife and treat her well. Defendant was not at our house, and I saw him no more until after the killing.

Mr. Aston testified for the State: I know defendant. Knew him a year or two in and about Granbury. Saw him three or four weeks before the killing. Was talking about his wife. Said that he loved her and hated to give her up. Said that if she wouldn't live with him she should not live with any one else. Defendant was a peaceable, quiet man. He sometimes took a drink, but never got drunk. I have been a saloon keeper in Granbury for seven years. Never heard any one say he was insane prior to the killing. It is my opinion he is sane. He was a peaceable, quiet man, so far as I know.

Mr. A. B. Foster, sheriff of Comanche County, testified for the State: I am sheriff of Comanche County. I saw defendant after he had given up to some citizens. Mr. Campbell was nearest to defendant. Defendant voluntarily handed me the pistol. I think it was a five-shooter. [A five-shooting pistol was here introduced in evidence as the one defendant had.] Defendant was neatly dressed, and I believe clean shaved, but am not certain. Defendant was then carried to the jail and searched. Defendant was in my opinion of sound mind and knew right and wrong. Defendant was calm and unexcited at the time he was turned over to me. I was with him nearly all that night, and talked with him then and often since in jail and on the train to Fort Worth and to Abilene at the times he was removed from Comanche jail by order of court to secure his safety and on change of venue. Never saw anything in my opinion indicating insanity.

J. N. Frizzell, the first witness for the defense, testified as follows: I live in Somervell County and have for a number of years. I am the father of the defendant. He is about 28 years old. Defendant was usually a very obedient boy. About the age of 8 years he began to have at different times spells of melancholy. He would sit for hours at a time during these spells without noticing anybody or looking up. When I would tell him to do anything during these spells he would often start and then go off apparently unconscious of the fact. He would never refuse to obey me. At one time when all of the family

was sick and while he had one of these spells I sent him after a bucket of water, and he started and got half-way to the well, set the bucket down and stopped awhile, and then went away and did not return again for several months. He had these spells often. About last July, 1890, defendant and wife came to my house on a visit. I was away at the time. When I came back he was out in the bushes. After a time he came toward the house. About half-way he stopped and looked straight up for a time and looked wild. After awhile he came to the house and for a long time he would not speak to me. At last he said, "Pa, I want to talk to you," and came and sat down near me. He looked wrong. He started to tell me something about his wife, but I refused to hear what he had to say, and told him I did not want to hear of his family troubles, as I was already troubled about him. I do not think defendant at the time knew the difference between right and wrong. Defendant told me of having been severely hurt at Sherman several years ago by being hit on the head with a wrench, and that he was sick for a long time from its effects. Defendant and wife visited my house twice before the time mentioned above and appeared all right. He always seemed to love his wife and treat her well. The mother of defendant had two brothers insane. One was very wild and had to be kept chained at night; was dangerous at times. The other was idiotic and foolish, but not particularly dangerous. Defendant's mother also had two brothers who were insane and had to be kept confined. Generally defendant was of sound mind and knew right from wrong. None of defendant's brothers or sisters were affected like him. Defendant was the weakest one of the family. I have seen defendant at various times when I did not think he knew right from wrong. He left me at 16, and since then he has probably lived with me one-third of his time. So far as I can tell the blow on the head did not affect his mind. In my opinion his mind is in as sound condition since as it was before receiving the blow. I saw defendant no more until I saw him in Comanche after the killing.

Jim Hastings testified for the defense: I live at Granbury, in Hood County. I knew defendant's wife and mother-in-law in July and August, 1890. They lived about one hundred and fifty yards from me in a tent. One evening about dark, about August 1, 1890, defendant came by my tent and asked me if I had his knife. He also said, "Come up to-night and camp with us." He had been at town and was coming back. I asked defendant how he was, and he replied, "I feel bully." After dark he came back to my house and said, "Get up and let's go hunting." About 10 o'clock at night defendant and wife and Jim Parsons came down to my house for camphor. After a time, about 11 o'clock, Mrs. Brown and defendant's wife came after me and wanted me to come up to their tent, as they said defendant was going crazy and was about to kill himself. I got up and went to their tent. Defend-

ant was complaining that he had had nothing to eat. Jim Parsons was there and a young boy. This occurred the same day that defendant and wife got back from old man Frizzell's. I staid a while and went back. Defendant was a quiet and peaceable man. I don't know whether he had any whisky that evening or not. He had been up in town.

Josiah Montgomery testified for the defense: I was at Mrs. Brown's the night that Jim Parsons took the knife away from defendant. They all said that defendant was going crazy. I was afraid of him. Defendant often had curious spells. I am 17 years old. Defendant did not eat supper with the rest of the family. Mrs. Brown fixed him something to eat in the night and he ate it.

Jim Parsons testified for the defense: I am the brother-in-law of the defendant. I and my wife were at Mrs. M. E. Brown's about the 1st of August, 1890. While there defendant did not appear right. Defendant was not drinking. Defendant refused to eat any supper; looked gloomy and melancholy. During the night defendant's wife came to me excited and said defendant was about to kill himself. I went to him and found him on the porch sitting in a chair alone; had his elbows on his knees, his face in his hands, with knife in his left hand, and the knife up next to his throat. I got the knife from him, and he complained of not having any supper. He looked wild and strange. He did not seem to be trying to cut his throat, but had the knife on his throat. Mrs. Brown fixed him some supper, and as he went to eat as he went by the safe he picked up a case knife, and I took it away from him. He only ate a little bread and drank a little tea. I think defendant was crazy that night. Mrs. Parsons, my wife, Mrs. Rhoda Martin, and Josiah Montgomery were there. Defendant and wife went home with me the next day and remained several days. Defendant appeared wrong all the time. Five days afterward I returned to Granbury and brought defendant and wife back to his mother-in-law's. While I was taking out my horses defendant came to me and wanted some meat, as there was none at the house. I took my horses out and went to the house and was in the kitchen when I heard a scream from defendant's wife. I went into the room where defendant and his wife and Mrs. Brown were, but defendant's wife would not tell me what was the matter. They sent up to town and had the sheriff to arrest defendant. His wife made no complaint, and they turned him loose. I took defendant with me and kept him until next morning, when I went to work on the rock quarry. Defendant seemed troubled and wrong. He seemed to think a great deal of his wife and always treated her well. I live in Somervell County and have for a number of years. We saw nothing of defendant for several months before the killing.

Joe Lee Frizzell testified for the defense: I am the half-brother of the defendant. I was at Jim Parsons' in August, 1890, when defend-

ant and his wife came home with him from Granbury. Defendant did not appear right. He took me off in the bushes and talked to me about his wife. He said somebody was talking about her and trying to separate them. I have seen defendant frequently have spells of melancholy and not appear to be right. He seemed to think a great deal of his wife.

Mr. Jim Frizzell testified for the defense: I am the brother of the defendant. I have seen him frequently in deep spells of melancholy, at which times he did not appear to know right from wrong. Once in Fort Worth he was at my house and he had a valise and he would put things in it and pretend he was a rich man like Jay Gould. I called attention of other persons to this fact. Another time in Cleburne he refused to leave the room when requested to by my wife, who was in a delicate condition. He never appeared to be a strong-minded person. He had these spells of melancholy frequently.

Mrs. Rachel Frizzell testified for the defense: I am the step-mother of the defendant. I have been married to J. N. Frizzell about eight years. Defendant lived with us a part of the time. He frequently had spells of melancholy, during which times he would sit around with his head down. Sometimes when I would speak to him in these spells he would look up and sometimes not. He was a good boy to me. He was not fussy or quarrelsome. He was kind and good to his wife, and seemed to love her. He and his wife came to our house in July, 1890. He seemed wrong and in great trouble. He did not seem to have his mind as he ought. He said he was in so much trouble he believed he would go deranged. I think he generally knew right from wrong except when he was in one of his spells. I said at the trial in Comanche that defendant generally knew right from wrong; that I had never known anything wrong with his mind, and when in these spells he would be just as I am when in deep study. Generally when he had one of these spells he would run away. I heard Mrs. Parsons and his father say he was crazy at times. He had these same spells before his marriage. I often, when tired, sit with my head down somewhat, as he does in those spells.

Drs. John Rodman and L. A. Grizzard testified for the defense, that they were practicing physicians and had some experience with insane persons. A person is most likely to become insane between the ages of 20 and 35. Insanity often appears in those in whom it is hereditary without any assignable cause and as quickly disappears; that insanity is not always accompanied with delusions, and when a person once becomes insane from any particular cause the recurrence of the same cause is very likely to produce insanity again. Frequently spells of melancholy in persons affected with hereditary taint of insanity indicate a diseased mind. During paroxysms of acute mania persons may commit a homicide and the will may be powerless to prevent.

The district attorney then gave a brief synopsis of the facts of the killing and the testimony of the defense relating to insanity (except the testimony of Jim Parsons and Joe Lee Frizzell, who had not then testified), and asked Dr. L. A. Grizzard, assuming these facts to have been established, in his opinion was the defendant at the time of the killing sane or insane? He replied that he could not say he was insane. When asked whether in his opinion the defendant at the time of the killing, under the facts as stated, knew the act to be wrong, he stated that he could not say. Dr. Grizzard further testified that a wound on the head sufficient to produce insanity or disease of the mind would soon produce such result. That if true that a wound occurred and no change in mental condition or character appeared afterward, then in his opinion such wound did not injure the mind.

Mr. Huston testified for the defense: I live in Hood County. Defendant worked for me last year. He is quiet and peaceable and provided well for his family. He was sane when I knew him, but weak-minded. Never heard any one say he was insane before the killing.

W. F. Reeves, sheriff of Somervell County, testified for the State in rebuttal: Knew the defendant. Have seen him several times within the last three years. I regarded him as sane from what I saw of him. Defendant was a peaceable and quiet man. Never heard of his being insane. For several years lived within one mile of defendant's father and of defendant in Somervell County, and knew all the family.

Mr. Henderson, deputy sheriff of Hood County, testified for the State: Have known defendant several years. I saw defendant at Cleburne, Johnson County, a week or two before the killing. Was asking me about his wife—talked as if he loved her. I told him she had left Granbury. He remarked to me, "It is a good thing she has left Granbury." In my opinion defendant is a sane man and was sane at the time I saw him in Cleburne. I arrested defendant in August, 1890, at Granbury, when his wife sent for me. She told me she was afraid defendant would kill her. She never made any complaint and never stated why she was afraid of defendant, so I turned him loose. Defendant was not drinking when I arrested him. From my conversation with her and defendant I understood they had a kind of a family fuss and that defendant was jealous of her. Defendant talked to me about it next morning. Defendant said he did wrong and was sorry for it.

J. T. Green testified for the State: Defendant worked for me about eight months ago. He is sane and knows wrong from right as far as I have been able to see. He worked well and was quiet and peaceable. He several times asked me for money to get some provisions. Never heard of his being insane prior to the killing.

Mr. Daniel testified for the State: I knew the defendant about six or seven months ago. He had a good character. Was sane during the

time I had dealings with him. He made purchases at my store. He was in my employ several days. Never heard of his being insane. He was a quiet, peaceable man, so far as I know.

J. W. Haley testified for the State: I have had defendant in jail here. in Abilene for several weeks. I regard him as a sane man, who knows the difference between right and wrong. I have had the custody of many insane men. .The defendant has never acted like an insane man.

On defendant's plea to the jurisdiction, T. H. Conner, judge of the court, testified that Eastland County was nearer Comanche County than Taylor County; that Eastland County adjoined Comanche County, and that while the killing had some notoriety in portions of Eastland County, in his opinion there could have been a fair trial of this cause in Eastland County; that when this cause was changed on the court's own motion to Taylor County there was no objection raised in the District Court of Comanche County, but was expressly agreed to in open court by defendant in person and by his attorneys.

W. O. Hamilton, district attorney, also testified to the same facts.

Upon the issue of insanity the court gave the jury the following instruction: "You are further instructed that among other defenses made in this case is that of insanity. You are charged that only a person with a sound memory and discretion can be held punishable for a homicide, and that no act done in a state of insanity can be punished as an offense. Every person is presumed to be sane until the contrary appears to the jury trying him. He is presumed to entertain, until the contrary appears, a sufficient degree of reason to be responsible for his acts; and to establish a defense on the ground of insanity it must be clearly proved that at the time of committing the act the party accused was laboring under such defect of reason, from disease of the mind, as not to know the nature or quality of the act he was doing; or, if he did know that, he did not know he was doing wrong; that is, that he did not know the difference between the right and the wrong as to the particular act charged against him. The insanity must have existed at the very time of the commission of the offense, and the mind must have been so dethroned of reason as to deprive the person accused of a knowledge of the right and the wrong as to the particular act done. You are to determine from the evidence in the case the matter of insanity, it being a question of fact controlled, so far as the law is concerned, by the instructions herein given you. Should you acquit defendant on the ground of insanity, the jury will so state in their verdict."

And at the instance of the defendant, gave the following additional instruction: "You are instructed that though a total want of responsibility on account of insanity be not shown, yet if the prisoner's mind was so far impaired as to render him incapacitated to form a deliberate,

premeditated design to commit a homicide, he should be convicted only of murder in the second degree."

The court refused to give the following instruction requested by the defendant: "You are further instructed that a safe and reasonable test in all cases would be, that whenever it should appear from all the evidence that at the time of doing the act the defendant was not of sound mind but was affected with insanity, and that such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. For in such a case reason would be at the time dethroned and the power to exercise judgment would be wanting. But this unsoundness of mind or affection of insanity must be of such a degree as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment and obliterating the sense of right and wrong, and depriving the accused of the power of choosing between right and wrong as to the particular act done. If it is true that defendant took the life of deceased, and at the time the mental and physical machine had slipped from the control of defendant, or if some controlling mental disease was in truth the acting power within him which he could not resist, and he was impelled without intent, reason, or purpose, he would not be accountable to the law. If on the other hand he was of sound mind, capable of reasoning and knowing the act he was committing to be unlawful and wrong, and knowing the consequences of the act, and had the mental power to resist and refrain from evil, his plea of insanity would not avail him as a defense. But if the mind was in a diseased and unsound state to such a high degree that for the time it overwhelmed the reason, conscience, and judgment, and the defendant in committing the homicide acted from an irresistible and uncontrollable impulse, it would be the act of the body without the concurrence of the mind. In such case there would be wanting the necessary ingredients of every crime—the intent and purpose to commit it."

*J. M. Wagstaff, Wm. H. Lockett,* and *T. D. Bledsoe,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Appellant was indicted in the District Court of Comanche County for the murder of his wife, A. A. Frizzell, in said county on or about the 24th day of January, 1891. It appears that within a very short time after the indictment was found a trial was had in the Comanche County District Court, and that the defendant was convicted at the February term, 1891, of said court. This conviction on motion of the defendant was set aside, and on the 26th of February the court of its own motion and for the reason: "It appearing to the court that by reason of the great notoriety and excite-

ment caused by this cause, and the consequent prejudices and opinions formed, that a new trial alike fair and impartial to the accused and the State can not be had in this county, it is accordingly further ordered that the venue of this cause be and the same is hereby changed and transferred to Taylor County, Texas, and to the District Court thereof, the same being situated in the Forty-second Judicial District."

1.   At the March term of the District Court of Taylor County the defendant pleaded to the jurisdiction of the court upon the ground that the venue was changed without his consent from Comanche County, and that the reason stated by the court for the change of venue was insufficient in law, but if sufficient then under the law the venue should have been changed to Eastland County in the Forty-second District, because the court house of said Eastland County was the nearest court house to the said Comanche County.   That Callahan County is the next nearest county seat to Comanche County, and is also in and part of the Forty-second Judicial District, and that neither in Eastland nor Callahan Counties was there any excitement or prejudice in connection with this case, and a trial alike fair and impartial to both the defendant and the State could be had in either of these counties.   That the court house in Taylor County is the farthest in the Forty-second Judicial District from the court house in Comanche County, and the defendant prayed the court to hear evidence in these matters stated in his plea.

This plea to the jurisdiction was overruled by the court, and the supposed error in the ruling is the first point made by defendant's counsel in their brief in this case.   By article 576, Code of Criminal Procedure, the district judge is authorized, where he is satisfied that a fair and impartial trial can not be had in the county where the case is pending, upon his own motion to change the venue to any county in his own or an adjoining district.   See also Brown v. The State, 6 Texas Ct. App., 286; Cox v. The State, 8 Texas Ct. App., 254; Boyett v. The State, 26 Texas Ct. App., 689; McCoy v. The State, 27 Texas Ct. App., 415; Willson's Crim. Stats., sec. 2200.

It is only where an application for a change of venue is made in behalf of the State or in behalf of the defendant that the venue is required to be changed to the nearest county to the county where the prosecution is pending.   Code Crim. Proc., arts. 577–582.   And the discretion conferred upon the district judges by article 576 is not restricted by article 581.   The action of the court in changing the venue upon its own motion will not be revised upon appeal unless it be shown that the defendant has been materially prejudiced thereby.   Bohannon v. The State, 14 Texas Ct. App., 271; Woodson v. The State, 24 Texas Ct. App., 153.   The court did not err in overruling defendant's plea to the jurisdiction.   Where the venue has been changed upon motion of the court the defendant is not prejudiced in his rights to move to change the venue from the county to which the court has changed it,

if he can show any of the statutory grounds provided for as reason for the change of venue in the first instance. Thurmond v. The State, 27 Texas Ct. App., 347. In this case, after the defendant's plea to the jurisdiction was overruled, he did not interpose an application for a change of venue from Taylor County, and there is no reason shown by him why the venue should have been changed from said last named county.

2. Defendant filed an application for continuance based upon the absence of several witnesses by whose testimony he mainly expected to prove facts and circumstances tending to establish the defense of insanity, which was the main defense relied upon in the case. In qualifying or explaining the bill of exceptions reserved to the overruling of this application for a continuance, the trial judge states that it was in fact a second application for continuance. The prosecution contested the application for a continuance on the ground of want of diligence, and in our opinion sufficient diligence is not shown. The learned trial judge's explanation moreover shows that on the trial four of the witnesses named in the application appeared, three of whom testified, and the other was presented and tendered to the defendant, but was not put upon the stand by him as a witness. Most of the facts proposed to be proved by a majority of the absent witnesses were proved by witnesses who testified on the trial. We do not believe that with the additional testimony of the absent witnesses a more favorable verdict for the defendant would result, because it appears that all the material facts connected with his plea of insanity have been fully developed by the evidence of the witnesses who testified.

It is a well established rule that it is only in a case where from the evidence adduced upon the trial we would be impressed with the conviction, not merely that the defendant might probably have been prejudiced in his right by overruling his application for a continuance, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted, that a reversal should be granted. Covey v. The State, 23 Texas Ct. App., 388; Browning v. The State, 26 Texas Ct. App., 432. It is not made to appear that the court erred in overruling the application for a continuance.

3. Defendant's second bill of exception was reserved to the admission by the court over his objection of testimony to the effect that the defendant had stated some months prior to the killing that if deceased did not live with him she should not live with any one else. Defendant objected to this testimony upon the ground that it was remote and indefinite. Antecedent threats are always admissible as proof of express malice, and it was not error to admit this testimony. Smith v. The State, 43 Texas, 643; Anderson v. The State, 15 Texas Ct. App., 447;

McKinney v. The State, 8 Texas Ct. App., 626; Willson's Crim. Stats., secs. 1037, 1043.

4. Defendant's third bill of exception was saved to the action of the court permitting the prosecution over defendant's objection to put in evidence some of the clothing worn by deceased at the time of the killing and to exhibit the shot holes in said clothing to the jury. This was not error.    Hart v. The State, 15 Texas Ct. App., 202; Levy v. The State, 28 Texas Ct. App., 203.

5. Defendant's fourth bill of exception was reserved to the language of the district attorney in his closing argument to the jury, to the effect that "the defendant was a tramp, a vagabond, and a villain."   In qualifying this bill of exception the learned trial judge says "the counsel for the defendant interrupted the speaker and stated the language objected to; he did not request the court to instruct the jury with relation thereto;" and the court remarks that at the time he was not impressed with the idea that it was necessary, because in reply to the objection that the prosecuting attorney was out of the record, the prosecuting attorney stated to the jury "that if the facts do not authorize the inference that the defendant was a tramp, vagabond, and villain, rather than an insane person, then he was mistaken."   We are of the opinion that no injury is shown by this bill of exception. . It is not shown that the remarks were such as under the circumstances were calculated to illegally affect the defendant's rights.   Walker v. The State, 28 Texas Ct. App., 503; Willson's Crim. Stats., sec. 2321.

6. Defendant's fifth bill of exception was reserved to the action of the court in refusing to give defendant's special requested instruction with regard to the issue of insanity.   The court did not err in refusing to give this instruction, because the law applicable to that phase of the case was fully, fairly, and favorably for the defendant submitted in the general charge already given by the court to the jury, which charge was in conformity to the rules upon that subject laid down by the statute and the decisions of the courts of this State.   Leach v. The State, 22 Texas Ct. App., 280; Willson's Crim. Law, secs. 81, 85, 90; and Penal Code, arts. 39, 40.

7. To the objection that the charge of the court omitted to instruct the jury to apply the reasonable doubt as between the several degrees charged on, we reply such omission is not error when the court has applied the reasonable doubt to the whole case, except in this, where the court has refused special instructions covering the omission.   McCall v. The State, 14 Texas Ct. App., 353; Hall v. The State, 28 Texas Ct. App., 146.   But in this case this objection urged to the charge is not borne out but is directly contradicted by the record, because in the eleventh paragraph of the charge the court expressly instructs the jury with regard to the reasonable doubt as to murder in the first and second degrees.

8. Another objection urged to the charge is that it did not instruct the jury anywhere that in case they found defendant was insane at the time of the killing they should acquit him. No special requested instruction was asked by the defendant upon this phase, and the court did instruct the jury in connection with its charge upon the law of insanity, "should you acquit the defendant on the ground of insanity the jury will so state in their verdict." This is almost literally in the language of the statute, Code of Criminal Procedure, article 722. In the absence of any special requested instruction upon the point we think the charge of the court was sufficient and was not calculated in any respect to mislead the jury or create a wrong impression upon their minds to the injury of the defendant.

9. It is insisted that the evidence is insufficient to support the verdict and judgment. It is claimed for the defendant that he established his defense of insanity and should have been acquitted on that ground.

We have given the record a most mature consideration in the light of the evidence concerning the horrible and unnatural crime for which appellant has been tried and convicted, the murder of his own wife, and we have been unable to find any testimony which would warrant us to conclude that the act was committed in a state of insanity and when defendant was incapable of entertaining that criminal intent essential to the crime of murder because his mind was so far dethroned of reason as that it could truthfully be said he was irresponsible for his acts.

Nothing has been made to appear to us in the record or in the earnest brief of the counsel for the appellant which has for a single moment caused us to question either the fairness and impartiality of the defendant's trial in the court below or the justice and legality of the conviction in this case. Therefore the judgment of the lower court is in all things affirmed.

*Affirmed.*

Judges all present and concurring.