[No. 2295.]

## Charles Smith v. The State.

1. **Practice—Continuance.**—A second application for a continuance which failed to state that the absent testimony could not be procured from any other source, and that the accused had reasonable expectation of producing it at the next term of the court, was insufficient, and was properly overruled.

2. **Same—Charge of the Court—Bill of Exception** taken generally to the charge of the court, specifying no particular error or errors, has no standing, and will not be considered by this court. In the absence of a proper bill of exceptions this court will examine the charge of the trial court only with regard to fundamental errors, or such as under all the circumstances of the case were calculated to injure the rights of the accused.

3. **Same—Murder.**—A former conviction of murder of the second degree operates as an acquittal of the higher grade, and should limit the charge of the court upon a subsequent trial to murder of the second degree,

and to such inferior grades as may be indicated by the evidence. An unnecessary and erroneous charge upon murder of the first degree and express malice, especially in view of the charge that the defendant could not be convicted in the first degree, is not cause for reversal of a conviction for murder of the second degree.

4. SAME—IMPLIED MALICE.—In testing the sufficiency of a charge of the court, it must be considered as a whole. Omissions in one part of the charge become immaterial if they are supplied in other portions in such manner as to clearly instruct the jury upon the issue involved, and protect the rights of the accused against prejudice. See this case in illustration.

5. SAME—SELF DEFENSE.—See the statement of the case for evidence *held* insufficient to present the issue of self defense, and therefore not to demand of the trial court a charge thereon.

6. SAME—INSANITY—CASE APPROVED.—The charge of the court in this case upon the defense of insanity is a copy of the charge upon the same subject in Clark's case, 8 Texas Court of Appeals, 350, approved by this court. *Held*, sufficient.

7. SAME.—Note the approval of Leache's case, *ante*, page 279, to the effect that the trial court properly refused a special instruction to the effect that insanity being shown to have existed prior to the homicide, the presumption obtains that the insanity continued to exist, and that, unless such assumption be rebutted, the jury should find the defendant insane at the time of the homicide.

8. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Nueces. Tried below before the Hon. J. C. Russell.

The indictment in this case was presented by the grand jury of Webb county, Texas. It charged the appellant with the murder of one Thomas Riley, in the said Webb county, Texas, on the fifteenth day of February, 1882. A change of the venue to Nueces county was awarded, and at the trial in that county the appellant was convicted of murder in the second degree, his punishment being assessed at a term of five years in the penitentiary.

John Barrett, the first witness for the State, testified, in substance, that the deceased was killed by the defendant in Sim Cooley's saloon, in Laredo, Webb county, Texas, on or about the day alleged in the indictment. The witness was standing in front of the saloon, with his back towards the door, when the fatal shots were fired. The witness then stepped into the billiard room, which was next to the gambling room, in which the shooting occurred. As he entered the billiard room at the front

door, the defendant entered at the opposite door, on his way out from the gambling room, with a pistol in his hand. At about that time Marshal Bob Shaw entered the saloon at the front door, and Deputy Marshal Johnson entered at the back door. A man named Hughes, who was then facing the defendant, threw his arms around the defendant. Shaw ordered defendant to surrender his pistol, which he did with apparent willingness. Defendant then asked to be taken into the gambling room to see Riley, and he was taken in there by Johnson. Riley lay face down on the floor, his face in a puddle of blood. The witness turned him over on his back. Riley breathed for a while, but died within thirty minutes. The witness was in the gambling room about an hour and a half before the shooting. Riley was then dealing a game of faro, at which the defendant was playing. Witness heard some conversation between defendant and Riley a short time before the shooting. Defendant was asking for gambling chips on credit, and Riley refused to supply him on those terms. Riley finally gave him chips representing a hundred or two dollars, and the witness left them playing. Witness heard no quarrel between the parties.

On his cross examination, the witness said that he went into the saloon within two minutes after the shots were fired. Shaw and four or five others went in with witness. When witness reached the gambling room, Henry Lewis was engaged picking up gambling chips from the floor. Henry Lewis was in the gambling room when the witness went into it last before the shooting. Lewis was then in the "look out."

Lee Ward testified, for the State, that he was in Laredo on the fatal day, and was in the bar room of Sim Cooley when the shooting of Riley occurred. The witness was in the gambling room a few seconds before the shots were fired. Riley was then sitting behind a table with some cards in his hands, and defendant was standing up in front of Riley and the gambling table. Defendant held some chips in one hand. He put his other hand behind him, and witness, seeing a row imminent, turned and left the gambling room. He heard some chips fall on the floor as he left, and when he reached a point some eight or ten feet into the billiard room he heard two or three shots fired. Witness did not see the shots fired. He went back into the gambling room about thirty minutes after the shooting, and saw some parties taking the body out. Riley was then dead.

Frank Webb testified, for the State, in substance, that he was

in the gambling room when the first shot was fired. Riley had been dealing a game of faro at which the defendant was betting. Defendant, having played in all his chips, asked for more. Riley shook his head, declining to furnish them. Defendant repeated his request for chips with which to play for even. Riley said that he had given him a chance and wanted to close the game. Defendant reached over the table with one hand and took up some chips. With the other hand he drew his revolver and shot Riley, and witness ran out of the room.

Harry Lewis testified, for the State, that he was in the "look out place" in the gambling room, facing the defendant and Riley, when the fatal shooting occurred. A dispute over a game of faro was the occasion of the shooting. Riley was sitting in the dealer's chair at the game table and had been running a game of faro. Defendant had lost all of his money and one thousand seven hundred dollars besides, and asked for more chips on credit. Riley refused to furnish them. Defendant reached over and seized a pile of chips and rapidly counted them. Riley reached over, recovered them and counted them back into the bank. He then seized the defendant's wrist. Quite a "tussle" ensued, but defendant finally wrenched loose from Riley, drew his pistol and shot Riley.

Cross examined, the witness said that he first met defendant at Fort Clark in 1878 and regarded him as unsound of mind then. He was reduced to a critical condition in Fort Clark and had to be placed under guard. He was in a low mental condition on the evening before the shooting of Riley. He dealt monte at Radick's saloon, but his game was closed on him. He came to Cooley's saloon that night and played at faro. His mental condition then was flighty and "luny." The witness and Riley were the faro dealers at Cooley's saloon and worked for a percentage of the winnings. Defendant attacked the game with some money, lost it and played in checks he obtained on credit to the amount of one thousand seven hundred dollars. Witness and Riley alternated in the dealer's chair throughout the entire night, during which the defendant played incessantly. They did not give the defendant a fair game, but cheated him. Defendant could not have been cheated as he was by witness and Riley if he had been on his mental balance. As it was, he was completely "off his nut," and it was comparatively an easy matter to cheat him. Quite a number of people were in the gambling room a few moments before the shooting, but almost

everybody left when the trouble came up. Witness went to Riley after he fell and the shooting was over, and found an uncocked pistol lying on the floor near Riley's body. Witness did not know who owned that pistol. Witness put the pistol in his pocket and after some hours gave it to James Haynes,. of Laredo. A Mexican man and the saloon porter were present when witness picked up the pistol. The possession of the pistol annoyed witness. Defendant, witness and Riley had been drinking all night, and at one time before morning they were all pretty full. Witness could not say that defendant was drunk at the time of the shooting, but there was no question in witness's .mind about defendant's mental condition. He was off his balance and was "luny." Witness knew he was "luny," and he and Riley systematically cheated him throughout the game. The State closed.

A number of witnesses were placed upon the stand by the defense to testify to the defendant's mental condition prior to the homicide. A number of them had known the defendant from early boyhood, and all of them for several years. They all concurred in declaring the defendant a flighty, mentally unbalanced man from his youth, and each related eccentric performances of the defendant at different periods, indicating insanity. Such performances included frantic flight from imaginary pursuers intent on his murder; the purchase of enormous quantities of personal wearing apparel, when he was already bountifully and extravagantly supplied. One witness testified that on one occasion the defendant mounted a stranger's horse in Fort Clark, seized a winchester rifle secured to the saddle and rode at a terrific pace to a mountain four miles distant, whence he was brought back by the witness. Another witness, who was an employe in a dry goods store, testified that the defendant came to the store one morning, kicked over several bales of carpeting standing at the door as signs, and proceeded to unroll the same on the street. The same witness testified that one of the defendant's uncles died a confirmed and hopeless, but harmless, lunatic, and that he has a living uncle who is imbecile and idiotic.

Jennie Miller and Jason Wilson testified, for the defendant, substantially as they did on the former trial of this case, which will be found reported in the nineteenth volume of these Reports, commencing on page 95.

A few witnesses for the State testified, in rebuttal, that neither

on the day of the homicide, nor at the various times before that, when they saw the defendant, did they have any reason to conclude that the defendant was mentally unsound, or otherwise than "all right."

The motion for new trial raised the questions discussed in the opinion.

*Stanley Welch* and *E. J. Hamner*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE.    I.    There was no error in refusing to grant defendant's application for a continuance.    It was his second application, and it does not comply with the statute, in that it fails to state that the absent testimony could not be procured from any other source, and that defendant had reasonable expectation of procuring the same at the next term of the court. (Code Crim. Proc., Art. 561.)

It appears from the evidence adduced on the trial that the material facts which defendant expected to prove by the absent witness were proved on the trial by other witnesses, and there is no ground for supposing that he was probably injured in his rights because of the refusal of the court to continue the cause.    Viewed in the light of the evidence adduced on the trial, the absent testimony was immaterial, and could not have benefited the defendant.    Besides, it was not made clearly to appear that the testimony of this witness could not have been obtained by deposition, before she became paralyzed, and yet at a time when defendant knew that by reason of her age and infirmity she might not be able personally to attend and testify on the trial.

II.    There is in the record a general exception to the charge of the court,—to the entire charge,—not pointing out any particular error complained of; not calling the attention of the court definitely to anything.    Bills of exception, when too indefinite to point out distinctly the matter complained of as error, will not bring such matter properly before this court for review. (Walker v. The State, 19 Texas Ct. App., 176; Phillips v. The State, Id., 158; Davis v. The State, 14 Texas Ct. App., 645.)    The primary purpose of a bill of exception to a charge of the court is to direct the attention of the trial judge to the particular error or errors complained of, thus affording him an opportunity to

correct the error or errors in time to prevent prejudice to the defendant's rights. This purpose is not accomplished by a general exception to the whole charge. A secondary purpose of such bill is to enable this court, on appeal, to readily preceive the error or errors complained of, without having to examine other portions of the record. A general exception to an entire charge affords this court no aid or information whatever in determining the correctness of the charge. Such being the character of the bill of exception in this case, we are not called upon to consider any errors in the charge which are not fundamental, or which were not in our judgment calculated to injure the rights of the defendant. (Mace v. The State, 9 Texas Ct. App., 110; Smith v. The State, 15 Texas Ct. App., 139; Gilly v. The State, Id., 287; Lewis v. The State, 18 Texas Ct. App., 401; Phillips v. The State, 19 Texas Ct. App., 158.)

III. After a careful scrutiny of the charge, we find no fundamental error in it. The court unnecessarily and improperly defined murder in the first degree, and express malice. This was no part of the law of the case, the defendant on a former trial having been acquitted of murder in the first degree. The charge should have been limited to murder in the second degree. (West v. The State, 7 Texas Ct. App., 150; Baker v. The State, 4 Texas Ct. App., 223.) We can not imagine, however, how this error in the charge could prejudice the defendant, as the jury were clearly and positively instructed that the defendant could not be convicted of murder in the first degree. Even if the evidence showed him to be guilty of murder in the first degree, he is not entitled to have the conviction set aside if the evidence and the law warranted a conviction of murder in the second degree. (Baker v. The State, 4 Texas Ct. App., 223.)

IV. Another error is found in the definition of *implied malice*, as given in the charge. The word "excusing" is omitted from said definition, and this defect in the charge was one of the grounds upon which a former judgment of conviction in this cause was reversed. (Smith v. The State, 19 Texas Ct. App., 95.) In the former opinion in this case a proper definition of implied malice was given, which definition the trial judge followed in his charge on the second trial, except that he omitted, inadvertently, we suppose, the word "excusing." This omission in the charge, on the former appeal, was held to be material error, because it was not supplied in any other portion of the charge, because the jury were no where informed by said charge that

homicide committed by an insane person is *excusable.* In the charge now before us, the defect in the definition of implied malice is fully supplied by other portions of the charge, so that the jury could not have failed to understand that, if the defend-ant was insane at the time of committing the homicide, such homicide was excusable, and they must find him not guilty. Considering the whole charge, the error in the definition of implied malice is immaterial, and was without prejudice to the defendant.

V.   There was no evidence fairly raising the issue of self defense, and therefore it was not error to refuse to give the spe-cial instructions upon this subject requested by defendant.

VI.   Upon the defense of insanity, the charge of the court is sufficient.   It is a copy of a charge approved by this court in Clark v. The State, 8 Texas Court of Appeals, 350.

VII.   It was not error to refuse the special charge requested by defendant, to the effect that when insanity has been proved to have existed prior to the homicide, the law presumes that it continued to exist, and unless this presumption be rebutted, the jury must find that defendant was insane at the time of the homicide.   This same question arose in Leache's case, decided by this court at its present term, and was there thoroughly ex-amined and discussed.   We refer to the opinion in that case for our views and reasons in full, and the authorities in support thereof.   In accordance with our decision in that case, we hold that the court properly refused to give the special charge above mentioned.   (See *ante,* 297.)

VIII.   That the evidence sustains the conviction, we have no doubt.   While there is evidence in support of defendant's plea of insanity, it by no means clearly establishes such plea.   On the contrary, we think the evidence establishes that, at the time of the homicide, he possessed that degree of sanity which ren-dered him legally responsible for the homicide.   As to the character of insanity which will excuse crime, we refer again to Leache's case, *supra,* where the subject is exhaustively treated.

Finding no error in the conviction for which it should be dis-turbed, the judgment is affirmed.

*Affirmed.*

Opinion delivered November 17, 1886.