### E. J. REEVES v. THE STATE.
*No. 664.   Decided May 18.*

**1. Evidence of Communicated Threats.**—On a trial for manslaughter, where the evidence showed that both deceased and defendant had made threats to kill each other, and there was conflicting evidence as to who was the aggressor, it was error to exclude testimony, that while defendant was in the house, before the killing, he was told by a third person that deceased was outside, and said he was going to kill defendant. *Held*, the evidence was admissible, as tending to shed light upon the question as to who was the aggressor.

2. **Charge of the Court—Self-Defense.**—On a trial for manslaughter, where the court, in charging the jury on self-defense, said, "If you believe from the evidence that at the time of the killing defendant shot deceased, he (defendant) believed, and was *justified in believing,* from the acts, words, or conduct of the deceased, that it was necessary to shoot him to save his own life," etc., he would be guilty of no offense. *Held,* that the words "justified in believing" were calculated to mislead and confuse the jury under the circumstances.

3. **Argument of Counsel—Law and Facts Before Jury.**—It is error to charge the jury that they were not to consider any law that had been addressed to them by counsel, whether applicable to the facts or not. No lawyer can discuss propositions except in a combination of law and facts.

APPEAL from the District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

The defendant was indicted for murder, and at his trial he was convicted of manslaughter and his punishment assessed at three and a half years in the penitentiary.

The facts are sufficiently stated in the opinion.

*Clark & Allen* and *Seay & Seay,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was tried in the court below for manslaughter, was convicted of said offense, and his punishment assessed at a term of three years and six months in the penitentiary; and from the judgment and sentence of the lower court he prosecutes this appeal.

In order to present the assignments, we will briefly state the testimony in the case. It appears that the defendant and the deceased had been friends up to a short time preceding the homicide. Deceased, whose name was Tom James, was a young man, and unmarried. The defendant was married and engaged in Dallas in the business of keeping a restaurant. A few days before the difficulty, it seems the defendant and his wife had parted, the wife of defendant going to a Mrs. Tarleton's house, who lived in Dallas. There is some testimony to the effect that James, the deceased, was intimate with defendant's wife, and that defendant believed James had something to do with her leaving him, and the difficulty occurred on account of such alleged intimacy. The evidence shows, that after Mrs. Reeves left her husband and went to Mrs. Tarleton's, the deceased was a frequent visitor at said house, and was there on the night in question and started from there with Mrs. Reeves, John Horn, and Lillie Boyle to go to the house where the homicide occurred, which was at the house of one Mrs. Caples, on Elm street. It seems that James went on ahead, leaving the other parties at a house below where the dance was going on, and shortly came back, and reported that there were certain parties at the dance. The ladies thereupon turned back, and Horn and deceased

went to the dance. They went into the room, and the defendant, who had preceded them to the dance, was engaged at the time in dancing a set with Mrs. Caples. While they were standing there, and after the set was concluded, the defendant, according to the testimony of the State, came out of the room by where deceased was standing, touched him on the arm, and told him he wanted to see him. They both left the room, and almost immediately after they got out of the room and in the yard the firing commenced. Three or four shots were fired. The deceased ran across the street, and fell down, and shortly after expired. No weapon was found on him. The defendant, according to the testimony, received a shot in his arm or wrist. The difficulty occurred in the dark, and in the midst of considerable confusion, and the testimony as to how it began and who was the aggressor at the very time the shooting occurred, is not clear.

In order to present the issue between the State and the defendant in the case, we will give sufficient of the testimony of the defendant and the State in order that the bearing of defendant's exceptions may be the more readily seen.

Robert P. Scott testified, that he was in the front of the house on the night of the dance. He was attracted by a noise a few feet from him. He looked down and saw two men standing pretty close together. They were apparently scuffling over something, and in half a minute there was a pistol fired. "As it fired, it did not seem that it hit anything, and the next time that I saw the blaze of the pistol the man to the north side (his back was to the north and this other man's back was to the south of the sidewalk) threw his head back and hallooed, 'Oh!' and dropped his hold of the pistol. They both seemed to have hold of it. Another shot was fired, and then the pistol snapped twice. One man ran across the street, and the other man went up the street. I did not know either of them. I could not tell how many pistols were in the shooting. I did think there was but one. I was about three steps from them. The pistol fired, and it seems that both had hold of the pistol. It seemed that the pistol fired between them. The first flash fired off down the sidewalk. The next flash was pointing to the man that stood north. The man that stood north ran off. The man that ran across the street was the man standing north. The flashes came towards him. I heard one of them say 'Oh!'"

Charlie Horn, for the State, testified, that he heard defendant say to deceased, "Tom, let me see you a minute," and Tom said, "All right." That they went out the door. He remained inside, and in a very short time the shooting began. That he went outside of the door when the shooting began. That he could see them, but could not tell one from the other. While the shots were being fired, he heard deceased halloo twice, while he was running across the street, "Oh!" That he went across the street where the deceased fell, and picked him up, and laid him on his back, when he died. He found him shot in the breast and under the jaw. He heard only three shots. That the shooting seemed

to be going in the direction Tom was going after witness got out. Tom was running when witness first got out; he seemed to be trying to get away. When he first saw him, he had his head turned towards Reeves; · was running about the time the first shot was fired.

Will Caples, for defendant, testified, that he was standing by the door, and heard somebody say, "Come here, Joe," and Reeves and deceased then went out, Reeves behind James. There was a crowd outside at the time. As soon as they walked out and had stood there awhile, they began talking and fighting. The witness saw a flash of fire; saw Reeves pull his pistol and shoot, which was after the first shot was fired. There was one shot before ever Reeves got his pistol out. "I saw his pistol. James fired the first shot. It wasn't long before the second shot. I did not see James pull his pistol. I saw the flash, but did not see the pistol at all, because he was standing with his back towards me. Didn't see James present his pistol. The second shot was fired, and another shot was fired, and then I heard James halloo, 'Oh!' Then he turned and ran. He hallooed after the second shot, I believe. The reason I have for saying James fired the first shot is because I saw Reeves pull his gun after that."

There is testimony in the record showing that both parties had made threats to kill each other, and that a bad state of feeling existed between them for a short time prior to the night of the homicide. The defendant, during the trial, proved by Mrs. Will Caples, a witness for him, that "she was in the set on the floor dancing with defendant, Joe Reeves, whom she had met for the first time that night; that it was at the end of this set that Joe Reeves was called by some one on the outside, and he went out, and in a little while she heard the shooting." In answer to a question propounded by defendant's counsel, she stated, that "some one came and touched him, Joe Reeves, the defendant, on the shoulder, and said to him, 'Tom James is out here and says he is going to kill you.'" The attorney for the State requested the court to exclude this statement from the evidence, and instruct the jury not to consider the same. The defendant resisted the motion, on the ground that said remark was legal evidence; that this is a case in which the evidence is conflicting as to whether the deceased or defendant began the difficulty, and a remark thus made to the defendant would shed light on the question as to who began the difficulty. Also, that this is a case in which the defendant appeals to the law of self-defense, and the remark testified to would shed light upon the motives of the defendant at the time of the shooting, and would aid him in convincing the jury that the defendant believed, at the time he shot deceased, that he apprehended immediate danger of death or serious bodily injury at the hands of deceased. That this was a communicated threat; and was legitimate in behalf of the defendant in cases of homicide where there is conflicting evidence as to who began the difficulty, or where the defendant relies upon the law of self-defense. The learned judge who tried the cause sustained the motion of the district attor-

ney to strike said evidence out. The defendant excepted, and now assigns the action of the court in this regard as error.

Upon what theory this evidence was rejected we are at a loss to know, as the evidence was clearly admissible, and the grounds stated by the counsel in his bill of exceptions were suggestive of the reasons therefor. The facts of this case present a theory in which the deceased may not have fought at all, and if he did not, and the defendant made an unprovoked assault on him, the jury might feel authorized to visit upon him a severer punishment than if they believed that the deceased entered into the combat and fought willingly. This rejected evidence certainly presented a view of the case in which the deceased was not only willing to fight but invited the difficulty. From this point of view, although the jury might believe that the defendant went out to engage in a mortal combat, yet the testimony would tend to show that he was invited thereto, and did not take any undue advantage of his adversary, and so the jury, although they might find him guilty, would have visited upon him the lowest punishment. Moreover, from the State's theory of the case, it is rendered doubtful whether the deceased was armed with a pistol on the occasion, and this testimony would tend to support the defendant's theory that he was, inasmuch as this evidence shows that deceased had just said that he was going to kill the defendant, which would presuppose that he was prepared for that purpose. Taking the evidence already stated, and in fact all the evidence in the case, it is left uncertain who was the immediate aggressor in the struggle which ensued on the outside of the house, and this testimony would tend to shed light upon that question, and the jury should have had the benefit of it for whatever it was worth to the defendant.

The court, in its charge to the jury on self-defense, instructed them as follows: "If you believe from all the evidence before you in this case, that at the time of the killing, the defendant, E. J. Reeves, shot Tom James, he, the defendant, believed, and *was justified in believing*, from the acts, words, or conduct of the said Tom James (before or at the time), that it was necessary to shoot him, the said Tom James, to save his own life or protect himself from serious bodily injury, then he would be guilty of no offense, and you should acquit him." Though this charge is followed up by a charge on apparent as well as real danger, yet the expression, "justified in believing," was, under the circumstances, calculated to mislead and confuse the jury, and to require them to believe that the acts, words, and conduct of the said James must have been real, and of that tangible character which would justify his belief of danger. And this language, used in the connection which it was, would tend to shut out of view the reasonable appearance of danger which would, equally with the real danger, have authorized the defendant to act in the premises.

The court further charged the jury as follows: "You are further instructed, that any argument of attorneys on either side of this case that was addressed to you about what was or was not the law of the

case, you can not consider, as under your oaths and the law of the land, you are bound to look alone to these instructions for the law applicable to this case." To this charge of the court defendant excepted, and now assigns the same as error. While it is true, as a general proposition, that upon the salient features of the case the jury are to be governed, as to the law thereof, by the charge of the court, yet can it be said that they are not authorized to consider or regard such legal argument as may be addressed by counsel in their presence to the court, which may be subsequently embodied in its charge, or that they are barred from attending to the application of the law to the facts of the case, without which no argument can be made? As was said by the Supreme Court of Tennessee, upon a similar question: "It is impossible to understand how counsel can make out a case from facts, while he is forbidden to state and argue the law applicable to the facts. It requires both facts and law to make a prosecution or defense in either civil or criminal proceedings. Without facts, there is no law to operate. To hold that the facts shall be argued, but the law shall not be presented with these facts, is to deny the benefit of counsel. The value of facts depends upon the law, and that governs them. No lawyer can discuss propositions except in a combination of facts and law." Hannah v. The State, 74 Tenn., 201. If the counsel in this case were making improper or baseless legal arguments to the court, it might have been the duty of the court, if deemed proper, to arrest the argument; or, if counsel were applying fallacious propositions of law to the facts of the case before the jury, to admonish counsel that such was not the law, or was not applicable to the facts of the case. But in our opinion it was a dangerous stretch of judicial prerogative, by the charge of the court, to tell the jury that they should not consider any law that had been addressed to them by counsel, whether applicable to the facts or not. There may have been, and doubtless was, an application of legal principles on questions of testimony and weighing evidence addressed to the jury by counsel and not embodied in the charge of the court, and yet, by the instructions of the court, they were to disregard the same. To the legal mind, perhaps, the charge in question was not misleading, but to a jury not composed of lawyers such a charge may have had the effect to have confused and misled them, and in the form here put, such a charge should never be given.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.