### OTTO WEIGE v. THE STATE.

#### No. 4459.   Decided June 13, 1917.

**1.—Murder—Insanity—Insane Delusion—Evidence.**

Where, upon trial of murder, the defendant pleaded insanity, and claimed to have acted upon an insane delusion of illicit relations between his father and his wife, general rumors as to this relation circulating in the community, are manifestly not admissible in evidence, unless it was brought to the knowledge of the defendant; however, the same fact was proved without objection by another witness. Following McLane v. Elder, 23 S. W. Rep., 757.

**2.—Same—Argument of Counsel—Insanity—Charge of Court.**

Where, upon trial of murder, the defendant pleaded insanity and supported his plea with strong evidence, the court submitting the issue to the jury in a proper charge, it was reversible error on the part of the State's counsel to disregard the court's charge to acquit in the event the defendant was found insane, and urge the jury to convict the defendant because then he would not go at large, would be tried for lunacy, and sent to the asylum; said argument not being in response to argument by the defendant. Following Smith v. State, 55 Texas Crim. Rep., 569. Prendergast, Judge, dissenting.

**3.—Same—Objections to Argument of Counsel—Practice in District Court.**

Where, upon appeal from a conviction of murder, appellant complained of a rule in the trial court which prohibited counsel for the defendant to make objection to the argument of State's counsel in open court, and required that such objection be made in a whisper to the trial judge, all of which was borne out by the record; held, that this exceeded the authority of the trial court, and that defendant has a right to be heard by himself and counsel under the bill of rights. Following Reeves v. State, 34 Texas Crim. Rep., 483, and other cases. Prendergast, Judge, dissenting.

Appeal from the District Court of Austin.   Tried below before the Hon. Frank S. Roberts.

Appeal from a conviction of murder; penalty, fifteen years in the penitentiary.

The opinion states the case.

*C. G. Krueger* and *Mathis, Teague & Mathis,* for appellant.—On question of court's charge of insanity. Witty v. State, 75 Texas Crim. Rep., 440, and cases cited in opinion.

On question of conduct and rule of the judge to make objections to charge: Washington v. State, 58 Texas Crim. Rep., 345, 125 S. W. Rep., 917; Wooten v. State, 57 Texas Crim. Rep., 89, 121 S. W. Rep., 703.

On question of argument of counsel: Crow v. State, 33 Texas Crim. Rep., 264; Marmute v. State, 67 S. W. Rep., 508, and cases cited in opinion.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of insane delusion, general rumor, etc.: Jones v. State, 50 N. H., 382; Titus v. State, 70 Vt., 16.

MORROW, JUDGE.—Supplementing what has been said and making more definite the reasons on which the majority of the court base their judgment that the record requires a reversal, the following observations are made:

The appellant killed his wife under very revolting circumstances. The only motive which from the evidence suggests itself to our minds is that of mental derangement on the part of appellant. While there is a conflict of evidence as to the sanity or insanity of appellant, his witnesses make out a strong case in support of the affirmative. The appellant was afflicted with many physical defects. He stuttered so that he could hardly be understood. He was so deaf that it was almost impossible to make him hear or understand a conversation. His faculties were impaired from sickness in childhood. There was testimony that his mental condition was bad. Many incidents in his life were related which could be explained only upon the theory that his mind was deranged. At times he would manifest great excitement with no apparent cause. He would form and act upon conclusions of fact which had no foundation in truth. Members of his family had undertaken to look after business transactions for him on the theory of his want of capacity. He had been charged with lunacy. He grew greatly excited about imaginary lawsuits. Experts as well as non-experts testified to his insanity. The expert described him as an imbecile with delusions and declared that at the time of the commission of the offense he did not clearly know the difference between right and wrong, did not realize the consequences and that his actions were not those of a normal man. On cross-examination the expert introduced by appellant testified that if there was a general rumor that his father and his wife were guilty of illicit relations and that appellant had heard of this rumor and believed that that was the real cause of the separation of his mother and father, such facts would not show a delusion. Subsequently, the State, over appellant's objection, introduced evidence of a rumor of this character existing in the neighborhood some years before the homicide. The court in qualifying the bill says that he permitted this testimony to meet that of the expert above mentioned and refers to the testimony of C. W. Schmidt, a State's witness.

Schmidt was a justice of the peace, a close neighbor of appellant,

and on the day on which the homicide took place had taken the appellant to town with him in his buggy. On his way back they stopped at appellant's sister's house, and appellant had a talk with his sister, which the witness did not hear. After this talk appellant told the witness that he had learned that his parents had separated and that it bothered him; that he was getting dizzy and everything was turning round and that his wife was the cause of it; that he had just learned that his parents had separated and that his wife was the cause of it; that his old father and mother had separated, and it troubled him; that on their way home they met appellant's uncle, and appellant got out of the buggy and talked to him. Afterwards he got back in the buggy and simply said: "This is too bad." This is about all the conversation that took place on the route home except that appellant said: "You got your paper, and I didn't get mine"; and then said he understood that it was because of the condition of the mail route. That when he got home he got out of the buggy without saying a word, and the same witness testified also that on one occasion before he had been called on by appellant's wife to go and hunt him. He had gone off with a gun, and after searching for him for some time they found him standing in the field with a gun in his hand, and he wouldn't give it up until one of the parties pretended he was going to shoot a rabbit, got the gun and fired at the imaginary rabbit, and he then took the appellant home. That on another occasion appellant had come to him and said that his wife and mother had filed a complaint against a person named and to prove it produced a paper, which the witness examined and found to be a deed to lands. Without going into detail, this witness testified to many acts which indicated an abnormal mind. The witness said that there was a rumor that appellant's mother accused his father of having improper relations with appellant's wife and that appellant told him about it, this conversation taking place the day of the homicide after appellant had stated that he had received the information from his sister that his father and mother had separated and that his wife was the cause of it. This conversation is the only thing we find in the record which would indicate that appellant knew of the rumor that was referred to in the cross-examination of Dr. Greenwood except that of the witness H. A. Schram, who testified that there was such a rumor several years before the homicide and that he thought appellant knew of it. It is quite doubtful whether this testimony or that of Schmidt would have been such evidence of appellant's knowledge of the rumor as would justify admission in evidence. The inference from Schmidt's testimony is more natural that he learned this in the conversation with his sister, and that of Schram is a mere opinion. We doubt the admissibility of this evidence under the circumstances. The rumor would manifestly not be admissible unless appellant's knowledge of it was proved by direct or circumstantial evidence. Considering the physical defects of appellant, such a rumor might have existed without his knowledge. Rumors

are not admissible to prove facts. 16 Cyc., p. 1213; McClain v. Elder, 23 S. W. Rep., 757. Where known to a defendant in a criminal case and where they relate to relevant matters, they may become admissible and in this case we think would be admissible if knowledge of their existence on the part of appellant was satisfactorily shown in evidence. In connection with this bill, however, we will say that it does not show reversible error even if the rumor was not admissible for the reason that the same fact was proved without objection by another witness.

There are several bills preserved to the argument of counsel. One of these was a strong appeal to the jury to convict the appellant even if they believed him to be insane. The court in his very carefully prepared main charge had instructed the jury that if appellant was insane or deranged to an extent that he was unable to know the difference between right and wrong as to the particular act in question, to acquit him. The argument amounted to an appeal to the jury to disregard this charge. At least it was subject to that construction. As quoted in the bill it was as follows:

"Gentlemen, you can go out and find this defendant guilty of murder and send him to the penitentiary, and the law is if you send him to the penitentiary he and his folks can call for a trial charging him with lunacy in the County Court and put him in the asylum if the jury find he was insane, because you can not put an insane man in the penitentiary, but if you should turn him loose, how do you know he will ever be tried for insanity and he might go back up where he lives and do the same thing over again, or kill his children."

The court in his qualification of the bill states that he regarded the argument as proper, based on the evidence in the case.

This court in a unanimous opinion written by Judge Ramsey, on motion for rehearing in the case of Smith v. State, reported in 55 Texas Crim. Rep., 569, discussing the same question upon facts peculiarly similar to those involved in the present case, held that the argument required a reversal of the case although there was a charge withdrawing it from the consideration of the jury. From that opinion we take the following quotation:

"As stated in the original opinion, the appellant made what seems to us to be a very strong showing of insanity. The facts of the burglary were proven beyond doubt. The only defense for all practical purposes was that of insanity. Therefore, it was of the highest importance that this issue should have been, as it was, fairly submitted to the jury, and that in the discussion thereof there should have been no such departure from the rules of fair debate as would have illegally imperiled or weakened the defense. . . . The State's attorney made the statement to the jury, as set out in the bill, as follows: 'I want a verdict of guilty in this case, because I do not want you to set a precedent in this county for turning people loose on a plea of insanity. If you turn this defendant loose, then these lawyers, like Stafford and Geddie will be pleading insanity for everybody that is prosecuted, and

if you are going to turn this defendant loose you had just as well tear down your courthouse and burn your docket.' "

The discussion of the matter by the court in the opinion mentioned and the review of the authorities therein referred to aptly apply to the record in this case.   Other cases in point are:   Crow v. State, 33 Texas Crim. Rep., 264; Jenkins v. State, 49 Texas Crim. Rep., 457; Murmutt v. State, 67 S. W. Rep., 510; Patterson v. State, 60 S. W. Rep., 560.

The opinion written in this case by the dissenting member indicates that the argument was made in response to an argument by appellant's counsel.   We fail to find this statement in the elaborate qualification of the bill.

Another point raised by this bill, as well as by bill No. 26, is that involving the rule of the trial court which prohibited the counsel for the appellant to make his objection to the improper argument of State's counsel in open court and requiring that such objection be made in a whisper to the trial judge.   While the judge trying the case has large authority to make rules for the government of his court which are not inconsistent with statutory or constitutional provisions, or the rules made by the Supreme Court, and it is highly commendable that such action should be taken in order that decorum may be maintained and that the litigants and attorneys may know in advance the rules they are expected to observe, we are inclined to believe, however, that in making and enforcing the rule in question the trial court exceeded his authority.

The right to be heard by counsel and a speedy public trial is guaranteed by the Bill of Rights.   Art. 1, sec. 10, Constitution.   While recognizing the sound and wholesome discretion vested in the trial judge in the conduct of trials, the appellate courts have been careful in safeguarding these constitutional rights.   Patterson v. State, 60 S. W. Rep., 560; Reeves v. State, 34 Texas Crim. Rep., 483; Roe v. State, 25 Texas Crim. App., 33; Lott v. State, 18 Texas Crim. App., 627.

The cases mentioned above in which reversals have resulted from improper arguments are but illustrative of the practice in this court as will be indicated by numerous authorities cited under article 724, Vernon's C. C. P.   To bring the ruling of the trial court before this court for review, a bill of exceptions is generally required.   Art. 744, C. C. P.   And this is true with reference to the argument of attorneys. Vernon's C. C. P., p. 541, subdiv. 28, and cases cited.   By articles 2066 and 2067, Revised Civil Statutes, provision is made for the preservation of a bill of exceptions showing the ruling of the court by the testimony of bystanders where the counsel presenting the bill and the court fail to agree as to what proceedings took place.   See decisions of this court construing these statutes.   Vernon's C. C. P., p. 558, subdiv. 39; Washington v. State, 58 Texas Crim. Rep., 345, 120 S. W. Rep., 917; Wooten v. State, 57 Texas Crim. Rep., 89, 121 S. W. Rep., 703.

It is self-evident that a compliance with the terms of these statutes

would be impracticable under the operation of the rule referred to in the bill of exceptions under discussion. Under its operation none but the trial judge and the attorney whispering the objection to the judge would be in a position to know what objections were made and to what subject matter they related or what ruling the court made thereon. So that if in preparing a bill of exceptions there was a disagreement between the attorney and the trial judge as to the terms of the objection or its subject matter or ruling, it would be futile for the attorney to call upon bystanders to settle the dispute, because they would be perforce of the rule in ignorance of the proceedings, and the litigant would be driven to accepting the bill of exceptions in the terms that the court prepared it, or consent to such qualification or modification of it that the court might make.

The judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).—Appellant was convicted of murder of his wife, and his punishment assessed at fifteen years in the penitentiary.

His only defense was that he was insane at the time he killed her. Appellant was about forty-eight years old when he killed her   At the time they had six living children, the youngest about two years old and the oldest perhaps sixteen or eighteen. His wife was with child by him when he killed her. His claim was delusional insanity. In the course of several years before he killed his wife it was shown by his parents and a few of his neighbors that he had some claimed delusions at intervals. These delusions, if so, however, were shown to have been at different times, considerable time elapsing between them, and as an illustration of how long these claimed delusions lasted at a time his father testified: "At certain times I talked to him and conversed with him, and the next day maybe he would be in a rush and wouldn't talk to you and talking nonsense to you. He would get over that in a day, maybe two or three days, and then when that was over, he would be as rational as any other man."

He stuttered very badly all of his life, so much so that he could hardly talk, and when he did at all it was with difficulty. When he was young, his hearing was somewhat defective. When he was about nineteen years old he had measles, which affected his hearing thereafter materially, and from time to time until he killed his wife his hearing became more defective, so much so that at the time he killed her and for some time prior thereto he was almost deaf, though as his father testified, by getting close to him and talking loud he could hear some. He was a farmer, owned and lived on his own farm. He was a good worker, attended to his business of all character, just such as a man in his business and walk of life would daily attend to. A large number of his immediate neighbors, who had known him and associated

with him from a few years to many years, testified in substance that he was sane, that he was not insane, knew right from wrong, notwithstanding the difficulty of his talk and of his defective hearing.

His father and mother had been married nearly forty-nine years and raised a family of children. A few years before he killed his wife he and his father lived· for a while rather near one another, though at the time of the killing and shortly prior thereto they lived perhaps several miles apart. On the morning before he killed his wife that night he went with one of his neighbors to an election and voted, returning home with this neighbor shortly before 12 o'clock at noon. In going he was as cheerful and communicative as usual. After they voted, in returning home he passed by one of his married sisters. He got out of the buggy, went in her yard or house and talked with her for a while. She then told him that their father and mother had separated and that his wife was the cause of it. As a matter of fact, his father and mother had just separated and divided their property between them. He did not know this until his sister told him. For some time prior to this separation it was current in the neighborhood, known by their neighbors generally, that the relationship between his father and mother .was strained and it was because of his mother's claim that improper relations had existed between his father and his wife. When his sister told him that their father and mother had separated and that his wife was the cause of it, it bothered and seemed to have incensed him. Evidently after reaching home from the election the circumstances show that he must have informed his wife of the separation of his father and mother and that she was the cause of it, and he must have "fussed at" her about it from that time until he killed her about 9 o'clock that night.

He did not testify. His daughter testified as follows: "My name is Edna Weige. I am eleven years of age. My mother's name was Louise Weige. My father's name is Otto Weige. My mother is now dead. I was at home on the night of the 26th of August, 1916, when my mother, Louise Weige, was shot. Besides my mother and I, August, Herbert and Jesse were at home that night. August is eight years old, Herbert five years old and Jesse two years old. My father, Otto Weige, was at home that night. When I went to bed my father was sitting on the porch, and my mother was sitting in a chair and afterwards went to bed. My mother first sat on the porch and then she was sitting in the room. After I went to bed my mamma woke me up. My mother told me that my father had shot her and I got up. My father shot my mother one time after I got up. He shot her with a rifle, and hit her one time on the arm with the rifle."

Cross-examination: "After my father shot my mother he went in the room and sit down and sit there a long time. He did not sit there until the neighbors come but he ran around in the hall. He did not light his pipe and smoke. He was not out on the porch smoking his pipe when the neighbors came. My mother 'phoned to the neighbors after

she was shot. She 'phoned to Mr. Schmidt. Two others came there with Mr. Schmidt. They came a long time after my mother was shot. It was about an hour before they came. After the shooting my father and mother went on the porch and stayed a minute. My father put the gun back upon the wardrobe. That is where the gun stayed. From the time of the shooting up to the time the neighbors came my mother did not say anything, but my father was fussing. He was in the same room with my mother. My mother was laying down on the bed. She was in bed just a part of the time. My father did not say anything to my mother about 'phoning the neighbors. He did not try to get her away from there. He did not try to put the shooting on somebody else."

Redirect examination: "When my mother went to the telephone my father tried to keep her from 'phoning. He ran her away. I do not know what my father and mother were fussing about. I have a brother named Oscar Weige and a sister named Dora Weige. Both of them are older than me. On that night they were at Star Hill at a dance."

The State proved up and introduced the dying statement of his wife. This much of it was in writing: "My husband Otto Weige shot me. I was in bed lying down asleep when he shot me & and the shot woke me up. He first shot me in the head, then in the leg & then in the stomach. I tried to get out of the door and he hit me with the gun; it was a .22 rifle. My husband had been to the election & came home & he told me that his father & mother were going to part & he said I was the cause of it. That was the only reason why he shot me that I know of. He shot me about 10 o'clock at night Saturday night." In addition, the county attorney, who took the written dying declaration, further testified that at the time she made and he wrote out and he and others witnessed said written dying declaration, Mrs. Weige also stated that after her husband came home from the election they sat out on the gallery, and he was fussing at her. "She said he was fussing about his father and mother separating."

The doctor testified that Mrs. Weige was shot in the top of her head through the skull into the brain tissue. Another shot was just below the navel; the other in the right leg; and that there was a big bruise on her left arm; that the shot through her stomach went through the foetus, and shortly before she died she gave birth to this foetus. She died about 11 o'clock on the morning of the second day after she was shot the night before.

Appellant has some twenty-six bills of exception. A large number of these were to the refusal of the court to give his respective special charges. A large number of the others were complaints of the argument of the district attorney. It is unnecessary to state or discuss most of these matters, as they present no error.

The evidence from no standpoint showed, or tended to show, that appellant was afflicted with any character of permanent insanity. At the most it tended to show some claimed delusions by him from time

to time, considerable time elapsing even between these. Hence, the court did not err in refusing to charge that if appellant was shown to have been insane at any time before the killing the legal presumption was that such insanity continued and he was affected thereby at the time of the killing. Such is not the law.

It will not be amiss to here state the principles of our law on the question of insanity as established by the uniform decisions of this court and the authorities. These principles are so tersely stated and the authorities collated in 1 Vernon's Ann. Crim. Stats., p. 18, et seq., they will be copied therefrom as follows:

"The law does not require, as the condition on which criminal responsibility shall follow the commission of crime, the possession of one's faculties in full vigor, or a mind unimpaired by disease or infirmity. The mind may be weakened by disease, or impaired, and yet the accused be criminally responsible for his acts. The accused can only discharge himself from responsibility by proving that his intellect was so disordered that he did not know the nature and quality of the act he was doing, and that it was an act which he ought not to do. If he had sufficient intelligence to know what he was doing, and to know that the act was wrong, and had the will and power to refrain from doing it, he is, in contemplation of law, responsible for the act committed. The rule adopted in this State as to the character of insanity which will exempt from responsibility for crime, is that at the time of committing the crime the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature or quality of the act he was doing, or, if he did know it, that he did not know he was doing wrong. The inquiry should be directed to his knowledge of right and wrong, with respect to the very act with which he is charged. Carter v. State, 12 Texas, 500, 62 Am. Dec., 539; Webb v. State, 5 Texas Crim. App., 596; Williams v. State, 7 Texas Crim. App., 163; Clark v. State, 8 Texas Crim. App., 350; King v. State, 9 Texas Crim. App., 515; Warren v. State, 9 Texas Crim. App., 619, 35 Am. Rep., 745; Johnson v. State, 10 Texas Crim. App., 571; Pettigrew v. State, 12 Texas Crim. App., 225; King v. State, 13 Texas Crim. App., 277; Thomas v. State, 40 Texas, 60; Erwin v. State, 10 Texas Crim. App., 700; Burkhard v. State, 18 Texas Crim. App., 599; Powell v. State, 37 Texas Crim. Rep., 348; Jones v. State, 31 Texas Crim. Rep., 252, 20 S. W. Rep., 578; Carr v. State, 24 Texas Crim. App., 562, 7 S. W. Rep., 328, 5 Am. St. Rep., 905; Ex parte Walker, 28 Texas Crim. App., 246, 13 S. W. Rep., 861; Evers v. State, 31 Texas Crim. Rep., 318, 20 S. W. Rep., 744, 18 L. R. A., 421, 37 Am. St. Rep., 811; Frizzell v. State, 30 Texas Crim. App., 42, 16 S. W. Rep., 751; Lacy v. State, 30 Texas Crim. App., 119, 16 S. W. Rep., 761; Lovegrove v. State, 31 Texas Crim. Rep., 491, 21 S. W. Rep., 191; Merritt v. State, 39 Texas Crim. Rep., 70, 45 S. W. Rep., 21; Lowe v. State, 44 Texas Crim. Rep., 224, 70 S. W. Rep., 206; Mitchell v. State, 52 Texas Crim. Rep., 37, 106 S. W. Rep., 124; Rusk v. State, 53 Texas

Crim. Rep., 338, 110 S. W. Rep., 58; McConnell v. State, 22 Texas Crim. App., 354, 3 S. W. Rep., 702, 58 Am. Rep., 647; Massengale v. State, 24 Texas Crim. App., 181, 6 S. W. Rep., 35; Giebel v. State, 28 Texas Crim. App., 151, 12 S. W. Rep., 591; Riley v. State, 44 S. W. Rep., 498; Cannon v. State, 41 Texas Crim. Rep., 467, 56 S. W. Rep., 351; Griffith v. State, 47 Texas Crim. Rep., 64, 78 S. W. Rep., 347; Kirby v. State, 49 Texas Crim. Rep., 517, 93 S. W. Rep., 1030; Kelley v. State, 51 Texas Crim. Rep., 151, 101 S. W. Rep., 230; Hogue v. State, 65 Texas Crim. Rep., 539, 146 S. W. Rep., 905; Roberts v. State, 67 Texas Crim. Rep., 580, 150 S. W. Rep., 627; Woods v. State, 67 Texas Crim. Rep., 569, 150 S. W. Rep., 633; Montgomery v. State, 68 Texas Crim. Rep., 78, 151 S. W. Rep., 813; Witty v. State, 75 Texas Crim. Rep., 440, 171 S. W. Rep., 229.

"The test of insanity is confined to the capacity to distinguish between the right and wrong of the particular act, and does not go to the capacity and will power of person affected with insanity to restrain his actions. Hurst v. State, 40 Texas Crim. Rep., 382, 46 S. W. Rep., 635, 50 S. W. Rep., 719.

"There are no degrees of insanity as a criminal defense; one's guilt being tested by the question whether he knew the nature and quality of his act. Kirby v. State, 68 Texas Crim. Rep., 63, 150 S. W. Rep., 455.

"Insanity must have controlled the will and taken away the freedom of moral action. Witty v. State, 75 Texas Crim. Rep., 440, 171 S. W. Rep., 229.

"Insanity merely exempts the accused from punishment without exonerating him from the charge of committing the offense. Witty v. State, 75 Texas Crim. Rep., 440, 171 S. W. Rep., 229.

"Every person is presumed to be of sane mind, until the contrary is shown. Carter v. State, 12 Texas, 500, 62 Am. Dec., 539; Fisher v. State, 30 Texas Crim. App., 502, 18 S. W. Rep., 90 (following Webb v. State, 5 Texas Crim. App., 596; s. c., 9 Texas Crim. App., 490); King v. State, 9 Texas Crim. App., 515; Massengale v. State, 24 Texas Crim. App., 181, 6 S. W. Rep., 35; Guerror v. State, 75 Texas Crim. Rep., 558, 171 S. W. Rep., 731.

"If insanity be proved to have existed at any particular period, it is ordinarily presumed to have continued. But this is the rule where the insanity proved is of a permanent character. Where the insanity is temporary or recurrent such presumption does not prevail, but, on the contrary, in such case, the law presumes the offense of such persons to have been committed in a lucid interval, unless it appears to have been committed in the time of his distemper. Leache v. State, 22 Texas Crim. App., 279, 3 S. W. Rep., 539, 58 Am. Rep., 638; Webb v. State, 5 Texas Crim. App., 596; Smith v. State, 22 Texas Crim. App., 316, 3 S. W. Rep., 684; Hunt v. State, 33 Texas Crim. Rep., 252, 26 S. W. Rep., 206; Nugent v. State, 46 Texas Crim. Rep., 67, 80 S. W. Rep., 84; Sims v. State, 50 Texas Crim. Rep., 563, 99 S. W. Rep., 555;

Wooten v. State, 51 Texas Crim. Rep., 428, 102 S. W. Rep., 416; Witty v. State, 69 Texas Crim. Rep., 125, 153 S. W. Rep., 1146.

"Accused has the burden of proving insanity by a preponderance of evidence. Roberts v. State, 67 Texas Crim. Rep., 580, 150 S. W. Rep., 627; Carter v. State, 12 Texas, 500, 62 Am. Dec., 539; Leache v. State, 22 Texas Crim. App., 279, 3 S. W. Rep., 539, 58 Am. Rep., 638; Hurst v. State, 40 Texas Crim. Rep., 388, 46 S. W. Rep., 635, 50 S. W. Rep., 719; Boren v. State, 32 Texas Crim. Rep., 637, 25 S. W. Rep., 775; Webb v. State, 5 Texas Crim. App., 596; s. c., 9 Texas Crim. App., 490; King v. State, id., 515; Johnson v. State, 10 Texas Crim. App., 571; Jones v. State, 13 Texas Crim. App., 1; King v. State, id., 277; Mendiola v. State, 18 Texas Crim. App., 462; Smith v. State, 19 Texas Crim. App., 95; Fisher v. State, 30 Texas Crim. App., 503, 18 S. W. Rep., 90; Lovegrove v. State, 31 Texas Crim. Rep., 491, 21 S. W. Rep., 191; Stanfield v. State, 50 Texas Crim. Rep., 69, 94 S. W. Rep., 1057; McCullogh v. State, 50 Texas Crim. Rep., 132, 94 S. W. Rep., 1056; Fults v. State, 50 Texas Crim. Rep., 502, 98 S. W. Rep., 1057; Kirby v. State, 68 Texas Crim. Rep., —, 150 S. W. Rep., 455; Welch v. State, 71 Texas Crim. Rep., 17, 157 S. W. Rep., 946; Douglass v. State, 73 Texas Crim. Rep., 385, 165 S. W. Rep., 933; Guerrero v. State, 75 Texas Crim. Rep., 558, 171 S. W. Rep., 731."

The court properly submitted the question of appellant's insanity in a charge on that subject in accordance with the said decisions and principles applicable to such question taken from charges frequently approved by this court. No others on the subject were called for or would have been proper.

The evidence did not raise, and, therefore, the court did not err in refusing to submit, manslaughter.

Appellant's contention that the separation of his father and mother was caused by his father's illicit relations with his wife, was a delusion on his part. He objected to the testimony of the witness Boelcher to the effect that he had heard five or six years before the killing in the neighborhood where appellant and his father lived a rumor of illicit relations between his father and his wife and that the report was that his mother and his father had several quarrels in regard to his father seeing his wife. The court's qualification of his bill on this subject was, that the fact of his killing his wife was not controverted and that his only defense was insanity; that his expert witness, Dr. Greenwood, as an expert, testified that in his opinion appellant was suffering from delusions or false beliefs and did not know right from wrong; that among other hypothetical questions propounded to said doctor, he testified: "I judge from the testimony it was purely a delusion"; and further he stated: "If it was a general rumor and the defendant heard it and believed that that was the real cause why his mother and father separated, *that would not be a delusion*"; and that he admitted the testimony of Boelcher on this point to meet the testimony of this expert witness; and in addition he stated that Mr. Schmidt, the neigh-

bor who went with appellant to the election that day and took him back home, testified that after appellant had talked with his sister and learned the fact that his father and mother had separated, appellant said that his (defendant's) wife was the cause of the separation, and that Mr. Schram, another witness, also testified fully about the rumor, and Mr. Schram also testified in substance that appellant knew of this rumor. All of this testimony under the circumstances and the claim of appellant was clearly admissible.

It is unnecessary to state appellant's bills to the argument of the district attorney other than Nos. 24 and 25, as none of them as qualified by the trial judge show any error.

But we will here give in full his bills 24 and 25 and the court's qualification, omitting the headings of them, which are merely the style and number of the cause, the term of court and the usual "Be it remembered."

His bill 24 is: "The following proceedings were had; while the district attorney was making his argument to the jury he used the following language, towit: 'Now if you turn him loose, what is going to become of defendant's little children? Are you going to try him again for lunacy? He has been tried for lunacy and the commission found him sane.'

"To which language and remark of said district attorney, to the jury, the defendant, by his attorneys, then and there in open court, duly objected: 1. Because that verdict can not and should not have any influence upon this jury. 2. Because it is not shown that the evidence upon the lunacy trial and this trial is the same; and 3, because the fact that the lunacy commission found him sane should not influence this jury in arriving at its verdict, and should not be taken into consideration by this jury in arriving at its verdict.

"Which objections were by the court overruled, to which action of the court in overruling said objections, the defendant, by his attorneys, then and there in open court excepted, and now here tenders this his bill of exceptions No. 24 and prays that the same be examined, approved and ordered filed as a part of the record in this case."

The court before approving this bill qualified and explained it, as follows: "The above expression by the district attorney was used in answer to argument of counsel for defense and specially in connection with the testimony of defendant's expert witness, Dr. Greenwood, who said the defendant, in his opinion, should not be released under any circumstances, should be confined for life, he was a menace to society, and further testified about the inadequate laws relating to the insane of the State, all of his testimony being admitted without objection. The former lunacy trial of this defendant and facts relating thereto was admitted without objection. Thought it proper for the district attorney to comment on testimony in record and the inadequate laws of the State relating to the insane. But in this instance as with all other objection urged by counsel to remarks of district attorney, at the

conclusion of his remarks and at the special request of defendant's counsel I instructed the jury not to consider the argument of the district attorney not based on the evidence and on the issues submitted in the charge, and not consider any law or issue except those given in the charge and determine those issues from the evidence adduced upon the trial under that charge and not consider what effect the verdict of the jury would have upon the State or defendant."

His bill 25 is: "The following proceedings were had; while the district attorney was making his closing argument to the jury (inter alia) he used the following language, towit:

"'Gentlemen, you can go out and find this defendant guilty of murder and send him to the penitentiary, and the law is if you send him to the penitentiary he and his folks can call for a trial charging him with lunacy in the County Court and put him in the asylum if the jury find he was insane, because you can not put an insane man in the penitentiary, but if you should turn him loose, how do you know he will ever be tried for insanity and he might go back up where he lives and do the same thing over again, or kill his children.'

"To which language and remarks of the district attorney, defendant's counsel undertook to object and as his attorney arose from seat and addressed the court, making his objections or attempting to make his objection, the court refused to hear the objection and ordered the attorney to take his seat. Said attorney protesting, saying that he thought that he was within his rights and that he knew no other way to make said objection, except by calling upon the court to stop the district attorney and hear his objection. The court ordered the sheriff to seat counsel and threatened counsel if he persisted in making said objection that he would place a fine upon counsel. That counsel, if permitted, would have assigned as a reason for said objection that said argument, especially the closing argument, would be potential as affecting the rights of this defendant before the jury; that there was nothing in the testimony, nor in the court's charge that gave to the district attorney the right to make that statement; that the only inquiry, so far as the jury was concerned, was as to whether or not the defendant at the time of the homicide was of such mental capacity as to know the difference between right and wrong; that the jury might be and would likely be influenced in the consideration of their verdict by said statement of the district attorney. The court refused to hear counsel upon his objections and permitted the district attorney to continue his argument, and refused, after the argument of the district attorney to specifically withdraw said remarks from the jury, which said remarks were highly prejudicial to the rights of the defendant as finally shown by the verdict of the jury, to the action of the court in refusing to hear counsel's objection, and his failure to instruct the jury not to consider same the defendant excepted in open court, and here now tenders this his bill of exception No. 25 and prays that the same be examined, approved and ordered filed as a part of the record in this case."

Before approving this bill the court qualified and explained it, as follows: "The same qualification made to bill No. 24 is applicable to said remarks of district attorney as set out in this bill and are made a part of this qualification. This bill states two objections: (1) To argument of district attorney; (2) to action of court. C. G. Krueger and J. M. Mathis were counsel for defendant in this case; after they had concluded their arguments to the jury and the district attorney had begun his closing argument, J. M. Mathis retired from the court-room to the juryroom adjoining, and Krueger remained in the court-room and advised the court that he was going to take exceptions to remarks of district attorney. I then proceeded to give special attention to the closing argument of the district attorney and according to rules governing trials and arguments before juries in my courts exceptions were taken by him to remarks of district attorney as set out in bills Nos. 19, 20, 21, 22, 23, 24 without any objection upon his part as such rule was well known to him and to J. M. Mathis that objections should be taken privately before the judge without interruption to the speaker and if the court was of opinion that speaker should be stopped the interruption would be made by the court instead of counsel. While the district attorney was discussing the record and testimony admitted without objection and was making the above statement to the jury, J. M. Mathis appeared at the door leading from the juryroom to the courtroom and from that position and not within the bar addressed the court and in a very loud voice interrupted the district attorney for the purpose of taking a bill of exception. He was advised not to interrupt the district attorney in that manner, but take his exception according to the rule of this court. The request of the court was wholly ignored and counsel again proceeded to tell the court about his rights and that he wanted to take his bill of exception in his own way. Great interest attended this trial and the courthouse was filled with people, and under the circumstances it appeared to me from my personal knowledge of Mr. Mathis that his real purpose was to make another short speech to the spectators and jury. I have little patience with interruption of court proceedings with such practice, and I ordered counsel to be seated as his cocounsel, Judge Krueger, was reserving exceptions to argument of district attorney, and when he refused and persisted in making further argument, I ordered the sheriff to seat the gentleman, and announced if he repeated such conduct I would assess a fine against him. Mr. Mathis took his seat and the incident was closed and the district attorney was permitted to conclude his argument without further interruption and the trial was concluded in an orderly manner. Objection was reserved to the above remarks of the district attorney by C. G. Krueger, and in such matters I do not require any formality except to know that the exception was taken. This remark was upon the law as it is written which everyone is presumed to know. These matters had been admitted in evidence without objection and in the light of this record I was not able to see how said remarks infringed

upon the rights of the defendant, but at the request of the counsel
for defendant that I verbally instruct the jury to disregard the remarks
of the district attorney, immediately after the district attorney had
concluded his remarks, I instructed the jury not to consider for any
purpose the argument of the district attorney nor conclusions stated
by him not based upon the testimony adduced upon the trial, and to
consider no law or issue except that given in the charge of the court
and upon evidence adduced upon the trial alone, nor consider what
effect their verdict might have upon the State or upon the defendant,
and not consider remarks of court or counsel on objections taken for
any purpose, but to be governed solely and alone by the law as given
in the charges and under this law render their verdict from the evi-
dence given them from the witness stand. No written requested in-
structions were asked, and by agreement verbal instructions were given."

These bills as qualified and explained by the court were accepted by
appellant, and the authorities are all to the effect that when this is
done, appellant is bound thereby.

The trial judge had no right or legal power to make a rule or enforce
it, to the effect that when the accused wants to object to the argument
of the prosecuting attorney, the prosecuting attorney must not be in-
terrupted, but the objection must be made privately to the judge him-
self. On the contrary, it is the right of the accused's attorneys, with
the proper decorum and in a proper way, to make his objections so
that they can be heard at the time by the prosecuting attorney and
even the jury. Of course, it is assumed that the accused's attorney will
do this in an orderly manner and at no time make frivolous objections
or objections to proper and legitimate argument, and it is the duty of
the trial judge at the time when such objections are so made to then
rule upon the question, and if the prosecuting attorney is out of the
record or making improper argument not based on the testimony in
the case or deductions therefrom, it is the duty of the court to then
pass upon the question, reprimand the attorney if necessary and then
intruct the jury to wholly disregard such illegitimate or improper argu-
ment by the prosecuting attorney and not wait until after the close
of the argument and then rule upon the question.

In the opinion of this writer these bills, and neither of them, show
any such error as would legally authorize or justify this court to re-
verse and remand this cause. In his opinion, the judgment should be
affirmed and not reversed. It is unnecessary, as he sees it, to discuss
the question or cite the authorities. It has always heretofore been held
that when the State's attorney in his argument is replying to an ac-
cused's attorney's argument he has no cause to complain. He can not
make an improper argument and thereby invite the State's attorney to
reply thereto and then if he does take advantage of his own wrong and
complain. 1 Branch's Ann. P. C., sec. 363, where he collates a large
number of cases, and see Mooney v. State, 76 Texas Crim. Rep., 549,
and the rules there shown and the cases there cited and discussed. The

bills, togetner with the qualification of the judge, in his opinion, show no error.

The judgment should not be reversed, but affirmed.