## HARRIS v. STATE. (No. 7184.)

(Court of Criminal Appeals of Texas. Feb. 28, 1923.)

1. **Witnesses ⬳53(4) —Cross-examination of defendant's wife as to matters testified to on direct examination held not error.**

Since the statute forbidding the wife to testify against her husband does not inhibit the cross-examination of the wife as to matters germane and pertinent to her testimony given on direct examination, in a murder prosecution, wherein defendant introduced evidence of illicit relations between his wife and decedent, and the wife on direct examination had admitted indulgence in sexual relations with decedent, it was not error on cross-examination to ask her whether decedent's conduct "made her mad," to which she replied that she "didn't think any more of him, but got to liking him pretty well."

2. **Homicide ⬳339—Exclusion of evidence tending to show manslaughter not error where verdict of manslaughter in fact returned.**

Exclusion of evidence by defendant's wife as to what occurred between her and defendant after the killing, which would have been but one item in the mass of testimony that the homicide took place under the influence of passion rendering defendant's mind incapable of cool reflection, was not error, where the jury rendered a verdict of manslaughter; defendant thereby attaining the result sought by the introduction of such evidence.

3. **Criminal law ⬳1119(5)—Failure to file evidence as to misconduct of jury until after adjournment held insufficient to disclose reversible error.**

Where, in a prosecution for murder, it was alleged that the jury was guilty of misconduct, but the evidence upon which the trial court refused to sustain defendant's contention was not filed until after adjournment of court, no reversible error was shown.

4. **Homicide ⬳340(1)—Inaccuracies in charge on manslaughter not reversible error, where it is sought to reduce charge of murder to manslaughter, in absence of injury to accused.**

Where the record in a homicide case presents no defense, and reliance is made alone upon the mitigating circumstances which would reduce the offense to manslaughter, errors cannot be successfully predicated upon inaccuracies in the charge on manslaughter, unless they are of a character to produce injurious results to accused.

5. **Criminal law ⬳1170½(6) — Improper cross-examination held cured by withdrawal from consideration of jury.**

In a prosecution for murder, where defendant introduced a witness who testified to contradictory statements of a state witness, and the state's counsel elicited from him on cross-examination an admission that he had paid a fine for aggravated assault upon his wife, error, if any, in the admission of such evidence, was cured by withdrawal from the consideration of the jury.

6. **Criminal law ⬳1166½(12)—Comment of court upon evidence held not prejudicial error.**

In a prosecution for murder of a doctor who was treating defendant's wife, and whom defendant suspected of having improper relations with his wife, where the wife testified that she told her husband she intended to quit going to deceased's office, and that deceased charged her a lot, to which the husband replied, "We will get it some way; we will get it all right," it was not prejudicial error for the court, in passing upon an objection to such testimony, to state that the conversation as to the money part thereof was immaterial.

7. **Criminal law ⬳942(1)—New trial for newly discovered evidence of impeaching character properly refused.**

In a prosecution for murder, it was not error to refuse a new trial where the affidavits disclosed that the newly discovered evidence sought to be introduced would be only impeaching.

8. **Criminal law ⬳945(2)—Newly discovered evidence not ground for new trial where it would not probably affect result.**

A new trial in a murder prosecution was properly refused, where the affidavit of the witness was that on the day of the homicide defendant said to the witness that he did not know about a third person being shot at the same time that deceased was shot, since such evidence would not probably affect the result.

9. **Criminal law ⬳1055—Exception to argument of prosecuting attorney after conclusion thereof held too late.**

In a prosecution for murder, where exceptions to the speech of the prosecuting attorney to the jury were not made until after the argument was concluded and the jury was preparing to retire, no ground for reversal was shown; the judge having no opportunity to rule upon any exception to the argument in time to correct its effects.

Appeal from District Court, Ellis County; W. L. Harding, Judge.

Bill Harris was convicted of manslaughter, and he appeals. Affirmed.

Bowd Farrar and Will Hancock, both of Waxahachie, for appellant.

Henry Tirey, Co. Atty., of Waxahachie, John H. Sharp, of Ennis, T. P. Whipple, of Waxahachie, and R. G. Storey, Asst. Atty. Gen., for the State.

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

MORROW, P. J.   The indictment is for murder; the conviction for manslaughter; punishment fixed at confinement in the penitentiary for a period of five years.

The deceased, C. W. Ray, was a physician. He had been treating the wife of the appellant for some time for tuberculosis. He and Dr. Jenkins had adjoining offices and used the reception room in common.

From the testimony of the appellant, it appears that from the conduct of the deceased and the wife of the appellant, the conversations between the appellant and his wife, and her own conduct towards him, he became suspicious of her relations with the deceased, and with the determination to satisfy himself, he secretly went into the space between the roof and the ceiling of the private office of the deceased and made a hole so that he might observe the conduct of the persons in the office.  On the next visit of his wife to the doctor's office, he secreted himself and observed their conduct through the aperture mentioned.  What followed is described by him, and from his testimony excerpts are taken as follows:

"They walked underneath me then; she leaned upon the table, and he helped her upon the table, putting his hands under her arms, and he began to fool with her skirts, got her dress up above her knees, and she pushed his hands down, and said: 'Doctor, I am sick; don't do that.'  And he dropped her skirts and run his arm around her waist, and her arms went around his neck, and they kissed; it looked to me like the sweetest kiss I ever saw her put out.  I could not stand it any longer, and I hollered.  I said: 'God damn it!  Don't do that!  I see you.'  * * *  In about a minute, I said: 'I don't intend to do nothing.  I am just coming down to talk to you.'  And he said, 'All right, come down.'  * * *  I walked in and said, 'Well, you are caught,' and he said: 'Now, Bill, don't take the wrong conception; your wife is straight.'  I told him that my eyes didn't deceive me from that hole."

An encounter ensued.  Dr. Jenkins entered the room, but was pushed out by the deceased with the remark: "This is our affair; we will settle it."  During the affray, Dr. Jenkins re-entered and the parties separated. Appellant and his wife left the office, and according to the appellant, they went to the cemetery, where they had a child buried, and at the grave of the child, appellant's wife admitted to him that her relations with the deceased had been criminal.  Upon their return to their home, appellant went to the doctor's office, stopping on the way to get a pistol.  He said that he got the pistol without the intention to use it save in protecting himself.  In describing the interview that followed with the deceased and Dr. Jenkins, we quote in part from appellant's testimony:

'I walked up and said, 'Dr. Ray, I want to see you two men in the private office,' and they followed me in there and closed the door.  Dr. Jenkins was on the left of me, and Dr. Ray was on the right.  I said, 'Now, men, I don't want this little trouble to get out—this little disgrace to get out.'  And Dr. Jenkins assured me that he would not say nothing about it, and I excused him from the room.  I did not want it to get out on account of my wife and babies; I did not then intend to kill anybody.  Then I said to Dr. Ray, 'You have done me damn dirty.' He said, 'Yes, Bill, but your wife is still straight.'  I said, 'Dr. Ray, she has told me everything.'  He kind of dropped his head, kind of grinned a little and said, 'Has she?'  This flashed right up into my mind.  I then said: 'Dr. Ray, as hard as I have tried to get your money for you, I find out you are playing my wife.  How would you feel if you caught me fooling with yours?'  He told me that I would not have any luck.  I said, 'If George McCalley knew of this he would kill you before sundown,' and he said, 'Yes, I believe he would.'  I said, 'Really, you think I ought to do it, don't you?'  He looked me from head to foot with the most impudent grin I ever saw.  He said, 'Yes, I ought to be killed.'  I said, 'Good-bye,' and I killed him.

"That grin flashed all over me like powder. It was under this condition of mind I formed the intent to kill him.  I could not control myself when I asked him if he didn't think he ought to be killed, and he looked over me from head to foot with that most impudent grin that I ever saw.  It seems as though Dr. Ray started toward me when I pulled the gun—kind of started with his shoulder over toward me, and I began shooting, and he ran against me, and I stepped to one side and finished shooting."

Dr. Jenkins gave his version of the affair, and from his testimony we take the following excerpts:

"When I went in, I took hold of Bill Harris' hand and asked him to stop, and Dr. Ray requested him to stop; and I asked what was wrong; and defendant pointed to a hole up in the ceiling and said: 'You see that hole up there, don't you?'  * * *  Dr. Ray said, 'There is nothing wrong, just his foolishness,' and then Mrs. Harris said, 'Let's go, Bill, there is nothing wrong between me and Dr. Ray.' Then defendant turned to me and said: 'God damn it! this is our affair, and you keep out of it.'

"In about an hour after defendant first left, he came back again.  * * *  When the defendant came in, he * * * said, 'Dr. Ray, I want to see you a minute,' and then he turned to me and said, 'You come in too,' and we walked into Dr. Ray's private office together. * * *  Harris said: 'Fellows, I am sorry for what I done this morning.  I don't want you to think that I think that my wife is crooked. I am through with this, and I don't want to hear anything more about it.'  * * *  And then Dr. Ray said: 'I'm glad you look at it that way, Bill.  I will assure you we will not have anything to say about it.'  And then defendant turned to me and said, 'I want to see Dr. Ray privately a minute,' and I walked out of the back door.  The defendant seemed to be perfectly calm and did not seem to be angry.  * * *  I had been in the front office about a minute.  * * *  I heard Dr. Ray

say, 'I will not give you money,' and then I heard Bill Harris say, 'That was a good piece,' and heard Dr. Ray say, 'I know nothing about it; I have had nothing to do with your wife,' and defendant said, 'You are a God damn lying son of a bitch.' And then Dr. Ray said, 'I know nothing about it,' and then defendant said, 'You are a God damn lying son of a bitch,' and when he said that I walked out through the back door of my private office and into the laboratory, and saw the defendant sitting on the table with a pistol in his hand pointed at Dr. Ray, and Dr. Ray was standing there with his hands by his side looking the defendant in the face; and I said: 'Bill, please don't shoot Dr. Ray. He has not done you any wrong.' And then the defendant shot —shot three times. The first shot hitting Dr. Ray in the chest. * * * I did not do anything toward interfering. * * * I·was standing·there looking, and the defendant turned the gun from Dr. Ray toward me and said, 'God damn you.' He shot at me and hit me in the left arm."

Some contradictory statements of the appellant and some of both the state and appellant's witnesses were introduced. By circumstances the state undertook to controvert the possibility of appellant observing the actions of the deceased and appellant's wife through the aperture in the ceiling.

The relations of the deceased and appellant's wife were combated by circumstances. Her reputation for virtue and chastity was attacked by a number of witnesses, as was that of the appellant for peace and quietude. Several of the witnesses impeaching the wife's reputation for chastity claimed that her bad reputation in that respect antedated the present trouble.

[1] Some 10 pages of the statement of facts are devoted to recording the testimony of appellant's wife elicited in his behalf, in which she recounts in great detail the beginning, consummation, and continuation of her illicit relations with the deceased. According to her testimony, she first submitted to his caresses with reluctance, but subsequently went regularly and often to his office and indulged in sexual relations. State's counsel, on cross-examination, asked her whether the conduct of the deceased "made her mad," to which she replied: "Well, I didn't think any more of him; I got to liking him pretty well." The statute forbidding the wife to testify against her husband does not inhibit the cross-examination as to matters germane and pertinent to her testimony given on direct examination. The testimony of which complaint is made came, we think, within this category. It bears such direct relation to the inquiry addressed by appellant to his wife upon direct examination as renders its receipt not improper. See Branch's Ann. Tex. Penal Code, § 152, and cases listed; also, Swanney v. State, 66 Tex. Cr. R. 293, 146 S. W. 548, and cases therein cited; Houston v. State, 83 Tex. Cr. R. 453, 204 S. W. 1008.

After relating the fact that he had, because of his suspicion of his wife's conduct toward the deceased, climbed up over the office of the deceased and made a hole in the ceiling through which he might observe their actions, appellant testified that after his return to his home, and while he was in bed with his wife that night, he reached over and pulled her up to him and started to pet her. He said:

"That night it was worrying me so that I reached over and pulled my wife up to me and started to pet her; I wanted to forget it. She pushed away from me and said, 'I don't want to be loved.' I said, 'Maybe you will want to be loved to-morrow.' It made her so mad she just flopped over and would not say anything more to me. I could not sleep none that night for thinking about it. The next morning I felt like I still had confidence some way, and I went on down to the slaughter pen to water some cattle, and it began worrying me again; something in my mind say, 'Go and look for yourself, and then you will be satisfied.' "

[2] While his wife was on the stand, appellant sought to prove by her this same occurrence. She did testify: "My husband that night was in a manner fondling with me and trying to caress me." She was not permitted to relate the remainder. If it be conceded that the excluded part of her testimony was admissible, its relevancy bore alone upon the state of appellant's mind; that is, it could have been used for no other purpose than to enable the jury to determine whether at the time the fatal shots were fired his mind was reduced by passion to a condition rendering him incapable of cool reflection. It was but an item in the mass of testimony upon the same subject related by appellant and his wife from which the jury determined that the homicide took place under the influence of passion rendering his mind incapable of cool reflection. Since the result to which the proffered evidence was directed was obtained, it is difficult to discern any sound reason why its exclusion should cause a reversal.

[3] The complaint founded upon the alleged misconduct of the jury is not presented in a manner permitting its consideration. The evidence upon which the trial court refused to sustain the appellant's contention was not filed until after the adjournment of court. It was held in Black v. State, 41 Tex. Cr. R. 185, 53 S. W. 116, that the statute required that evidence heard upon the motion for new trial be filed during the term to authorize its consideration. This rule has been uniformly followed in subsequent decisions.

[4] Complaint is made of the refusal to amend the charge on manslaughter in response to an exception addressed to it and in declining to read to the jury a special charge proffered by the appellant. We fail to perceive any ground for just criticism of the court's charge upon the subject or be-

cause of his action in refusing the special charge. Manslaughter being his only defensive theory, it would seem that defects which bore alone upon the charge on that subject would pass out of the case upon the acquittal of the appellant of the offense of murder. Both reason and authority concur in supporting the view that the record presenting no defense, and reliance being alone upon the mitigating circumstances which would reduce the offense to manslaughter, errors cannot be successfully predicated upon inaccuracies in the charge on manslaughter unless they be of a character to produce injurious results to the accused. In the instant case, the charge on manslaughter, so far as this court is able to discern, is subject to no just criticism and no supplement in the way of a special charge was required to fully guard appellant's rights. However, if the contrary were true, there being nothing in the charge which could injure the accused, and the jury having reduced the grade of the offense to manslaughter, the complaint against it is not entitled to prevail. Illustrative cases are Miller v. State, 84 Tex. Cr. R. 168, 206 S. W. 524; Wheeler v. State, 87 Tex. Cr. R. 646, 224 S. W. 782; Hoover v. State, 89 Tex. Cr. R. 378, 230 S. W. 982; Shields v. State, 89 Tex. Cr. R. 421, 231 S. W. 779; Baker v. State, 87 Tex. Cr. R. 305, 221 S. W. 607.

[5] A witness introduced by the appellant testified to alleged contradictory statements of the state witness Jenkins. State's counsel elicited from him on cross-examination the admission that he had paid a fine for aggravated assault upon his wife. Shortly after receiving the testimony, the court verbally instructed the jury to disregard it and repeated the instruction in its written charge to the jury. The exception based upon this action of the court, we think, does not justify a reversal of the judgment. Many cases are found in our reports in which the court has held that error in admitting improper evidence was cured by withdrawal, and many others in which the contrary ruling has been made. See Vernon's Texas Crim. Stat. Vol. 2, p. 905, subd. 30. Obviously, the matter is one which depends upon the nature of the case, the illegal evidence, and the facts legitimately before the jury. The evidence in question was admitted purely for the purpose of impeaching the witness Jenkins. It bore alone upon his credibility. The evidence was to the effect that Dr. Jenkins, shortly after the homicide and while he was in the sanitarium, had said that, while in his office, the deceased was hurrahing Mrs. Harris about wearing short skirts, and that he took his hand and pushed it against her skirt and said, "Your skirt is all right this morning;" that Jenkins also said that he did not see the shooting; that he heard the appellant cursing and went to the back door, and seeing that the appellant was going to shoot, he jumped to the right, otherwise he would

have been shot in the heart. The testimony given by Dr. Jenkins has been set out above. as well as that of the appellant. By the latter's testimony, it is made clear that he shot the deceased, as he claims, because he was enraged by the manner of the deceased while discussing his relations with appellant's wife. The legal evidence to sustain the verdict being adequate, and the statement of Dr. Looney, which is complained of, having been promptly withdrawn, if the evidence was improper, injury to appellant is not reasonably apparent, and a reversal of the judgment is not authorized. On this subject, see Redwine v. State, 87 Tex. Cr. R. 391, 221 S. W. 605; Armstrong v. State, 88 Tex. Cr. R. 433, 227 S. W. 485; Branch's Ann. Tex. Penal Code, § 382.

Appellant testified to a number of incidents in his relations with his wife which led him to entertain a suspicion touching her relations with the deceased. Among others, he said that one night after she had been to the doctor's office, after appellant and his wife had retired, she remarked: "I believe I will quit treatment; I don't believe I will ever get well." And appellant said, "Honey, you are just doing fine." And she said: "Well, it costs us too much money. I do not believe I'll get well." Appellant said: "I think you will, and we will get the money some way or other." Upon the examination of Mrs. Harris, she testified upon the same subject as follows:

"And I was talking to my husband one night and told him that I believed I would quit going up to Dr. Ray's office, and my husband said, 'We have always gotten along very well, and we will get by somehow,' and I said, 'He charges a lot,' and my husband says, 'All right, we will get it some way; we will get it all right.'"

During this examination, objection was urged that the testimony was hearsay. The court in passing upon the objection stated that the conversation as to the money part of which we testified was immaterial. Exception was reserved to this remark, and the matter is brought forward for review. On this subject, in a recent case, it is said:

"Any comment by the court upon the weight of the testimony or credibility of the witnesses is an infringement of the legal rights of the accused on trial, made so by statute. Simmons v. State, 55 Texas Crim. Rep. 444; C. C. P. art. 787. It is not every comment, however, that requires reversal, for the reason that all comments are not harmful, and the question whether the judgment is to be reversed is determined not upon the language used in making the comment, or the fact that the comment is made, but upon the consequences which probably result therefrom." English v. State, 85 Tex. Cr. R. 457, 213 S. W. 632.

[6] Considered in the light of the record before us, we are of the opinion that the remark of the court was not of a harmful nature. Pilgrim v. State, 59 Tex. Cr. R. 235,

128 S. W. 128; Wofford v. State, 60 Tex. Cr. R. 624, 132 S. W. 929; Smith v. State, 81 Tex. Cr. R. 373, 195 S. W. 595; Ahlberg v. State, 88 Tex. Cr. R. 173, 225 S. W. 256.

Appended to the motion for new trial is the affidavit of one Verne Smith, to the effect that he was in the sanitarium when Dr. Jenkins was operated on for the wound received at the same time that Dr. Ray was killed, and heard Dr. Jenkins say that he was in his office and heard Dr. Ray and Harris talking pretty loud, like they were quarreling; that he heard a shot and ran into Dr. Ray's office and saw they were fighting, and ran between them and was shot by Harris.

There is also appended to the motion the affidavit of one Godfrey, to the effect that on the day of the homicide, appellant said to the witness: "I don't know nothing about Dr. Jenkins being shot."

[7] Predicated upon these affidavits, appellant insists that the trial court was in error in refusing to grant a new trial. We are not in accord with this view. Smith's testimony was only impeaching, and the court's action is supported by the well-established rule against a new trial upon newly discovered evidence purely of an impeaching character. See Vernon's Texas Crim. Stat. vol. 2. p. 785, note 9, and cases cited.

[8] The remark imputed to appellant by Godfrey having been made by appellant to the witness, who was the officer arresting him, we think, would not be classified as newly discovered evidence. Moreover, we think the action of the court is supported by the rule justifying the refusal to grant a new trial on newly discovered evidence, the nature of which is not such as would probably affect the result.

[9] A bill of exceptions covering some 10 pages of the record is devoted to the complaint of the argument of the prosecuting attorney. A number of excerpts from his speech are embodied. The court approved the bill, stating:

" * * * With this qualification no exception was made to the argument until the argument was concluded and the jury preparing to retire to consider their verdict, at which time counsel for defendant stated to the court that he excepted to the inflammatory remarks of the county attorney."

It is obvious from the qualification that the trial judge had no opportunity to rule upon any exception to the argument. As was said by this court, speaking through Judge Hawkins, in a recent case:

"If the argument is legitimate he ought not to be interrupted; but if objectionable the complaint should be made promptly at a time when the trial judge can correct as far as possible the effects of any transgression of the rules. If an improper argument is made unwittingly, and counsel's attention is called thereto, it is frequently within his power to correct it himself." Simmons v. State (No. 7063) 248 S. W. 392, not yet [officially] reported.

It is conceived that the orderly procedure which must characterize a trial demands that the complaint that in his argument counsel is transcending legitimate bounds should be addressed to the trial judge at the time, so that he may determine its propriety and use his authority to counteract any injustice that may portend. It is fair that the counsel should be accorded occasion to himself withdraw any inaccurate or objectionable feature of his remarks to the jury. When the opposing counsel sits silent, he waives any argument of his adversary that can, in consonance with the orderly administration of justice, be waived. This court has found occasion, in the case of Weige v. State, 81 Tex. Cr. R. 476, 196 S. W. 524, to express its views on the subject. In the remarks in hand, we find nothing of such a nature as would have justified the interference of the trial judge under the circumstances confronting him at the time the complaint was first made of the argument in question.

The record reveals no error that would warrant this court in disturbing the verdict.

The judgment is affirmed.