JOSHUA RILES v. THE STATE.

No. 14279.  Delivered April 29, 1931.

The opinion states the case.

*Thad E. King* and *J. H. Phipps,* both of Galveston, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is rape; the punishment, death.

Touching the circumstances, prosecutrix, Mrs. Dorothy Griffice, testified, in substance, as follows: Leaving her home about 9:15 p. m., she walked down 23rd Street in the City of Galveston for the purpose of meeting her husband, who worked at Levy's. For some reason her husband failed to appear, and it being too late to go elsewhere, she walked down Post Office to 21st Street until she came to the alley between Avenue L and Avenue M. She noticed a negro standing near the alley. He startled her by saying: "Is Frank there?" She had an uncle named Frank Bautsch, and, believing the negro referred to her uncle, she had just started to answer him when he grabbed her by the throat and draggd her down the alley. Cursing her for a bastard, the negro threw her on the ground on her back and got on top of her, saying to her, in substance, that he was going to have sexual intercourse with her. Tearing her clothes, he tried to make her open her underwear. She fought him to her utmost, but he choked her until she was exhausted, saying that if she screamed he would kill her. She weighed 95 pounds. The negro was large and powerful. Notwithstanding her efforts to prevent the outrage, the negro succeeded in having sexual intercourse with her. Having completed the act, he jumped up and ran away. At this point we quote the testimony of prosecutrix on direct examination as follows: "All of a sudden he jumped up and I dropped my purse. My watch had a clasp that if you touched it a little it would fall off, and I dropped that, and he jumped up off of me and ran, and the minute he let me go I screamed, and there was some people living in a house overlooking the alley, and they had some lights up there and I saw him. I got a good look at the fellow. I saw his face just as plain as day. I could even tell the way he was dressed. The light was overlooking the alley. The minute he got up I screamed and I believe a lady came to the window and asked who was down there, and I said to catch that negro. He was running real close to the garages. Anyway they said to come upstairs, and I said 'No, I can't' or something. Anyway they came down and I don't remember what I said to them, but I told them to look for my watch. I was worried about that and I wanted my purse too, and the man said 'Where do you live,' and I told him. I don't remember what I said, but he brought me home and left me at the gate at 2008 Avenue M, just about a block away from the place."

Touching her identification of appellant, prosecutrix testified on cross-examination as follows: "I saw him standing there, and when he was right over me I could not help see his whole face. I saw some people, passing the alley just before he jumped off, as I said before, but they never did come back, and I didn't know who they were. It was pretty far down the alley. There were some lights shining from a window above the alley. I mean there is a garage right where he dragged me on the opposite side, and over that there is a house, and there were

some lights up there, and I got a good view of his face, and I can tell you the way he was dressed too. The house with the lights in it was on the north side of the alley, on the south side. I absolutely know what he looked like and he makes about the seventh person I have viewed, and I absolutely know it is him. I still had presence of mind enough to remember his appearance. I am not sure whether I lost consciousness or not during the attack. Everything was as if in a dream, but I absolutely know what he looked like, and I know what he did to me. I don't mean everything was like a dream from the time I first started across the alley. I mean when he dragged me by the throat, and when he dragged me down the alley. His grab was so tight on my throat. Everything was clear all right. I saw his face absolutely, and I know what he did to me. I heard the questions he asked me. There is no doubt in my mind that that is him. I remember those things clearly. I am positive he made those statements to me. I certainly noticed his features—anybody with that face, and look at those big lips —everything. During the time of this occurrence and the time when I first saw the defendant I described him to Sergeant Biaggne. * * * I am positive that the man who attacked me is the defendant. Why I can shut my eyes and see his face."

Mr. Vanskike and his wife, who lived in the house near the alley, testified to having heard a woman scream. Upon making an investigation they found prosecutrix in the alley. She told them that she had been assaulted and robbed. They discovered red marks on her throat and her face looked like she had been strangled or choked. She was gasping for breath. Her clothing was ragged and looked like it had been torn. She told the witnesses that the negro had sexual intercourse with her. There was a mark in the sand which looked like it had been made by the toe of a shoe. These witnesses said there was a light from their window into the alley but that it was not very bright. According to their statement, they were unable to see the scene of the struggle without the use of a flashlight. The mother of prosecutrix testified that her daughter immediatly reported the matter to her upon arriving home. She said prosecutrix screamed and fell upon the bed, saying "Oh mother, mother, am I hurt?" The clothing of prosecutrix was torn and on her back were small bits of grass. There were imprints on her neck, and her eyes were burging out. She told her mother that a negro had assaulted her and had sexual intercourse with her. An officer testified that he went to the scene of the outrage and found imprints of large feet and places in the sand appearing to have been made by the toes of shoes. Taking prosecutrix to jail at a later date, the officer showed her six or seven negro men for the purpose of seeing if she could identify her assailant. There were two men standing and one sitting on a bench. Appellant was standing some distance back of these men. At the command of the

officer he came a little closer. Upon seeing him, prosecutrix backed out of the room, and, pointing her finger at appellant, said: "That is the man." All of this testimony went in without objection.

Prosecutrix testified that the attack occurred on March 29th but stated that it was on Friday night. After the State had rested its case appellant placed several witnesses on the stand in an effort to establish an alibi. Mr. Uhr, one of the witnesses, testified that he was time-keeper, and material man for W. A. Kelso in Galveston; that he had on his payroll the name of W. Wilson for the night of March 29th; that he did not know whether it was appellant or not who worked on the occasion in question under the name of Wilson; that W. Wilson did not work for him on the night of March 28th, having begun his labors on the night of the 29th of March. H. J. Devlin testified that appellant was at work for Mr. Kelso on the night of March 29th but that he was not employed nor at their place of business on Friday night, March 28th. Appellant did not testify in his own behalf, and offered no further testimony. After it had been shown that appellant was work-ing for Mr. Kelso on the night of March 29th, the State placed Geo. A. Seale, editor of the Galveston Tribune, on the witness stand. Mr. Seale testified that he published a story with reference to the assault on prosecutrix; that the Galveston Tribune was an afternoon daily paper; that it was published at about 2:45 p. m. on March 29th; that it carried a story of the assault which showed that it occurred on Fri-day night, March 28th. He said further: "If the event had occurred on the night of March 29th it could not have appeared in the issue of the Galveston Tribune on the afternoon of the 29th." The paper was offered in evidence merely for the purpose of showing the date of March 29, 1930, the story contained therein not going to the jury. Although it had been clearly established by the State's testimony that the offense occurred on March 28th, and notwithstanding the fact that appellant's witnesses had only given testimony showing that he was at work at Kelso's on March 29th, appellant made no effort to offer testimony tend-ing to show that he was at another and different place on the night prosecutrix was assaulted.

We are unable to reach the conclusion that the evidence is insuffi-cient to support the conviction.

In his motion for new trial appellant averred that he did not have a fair and impartial jury to try him, in that one Quoyser, who served as a juror, was prejudiced against him, and had so expressed himself prior to qualifying as a juror. The specific averment touching the alleged pre-judiced juror was that prior to being selected as a juror he had said "I know what he will get if I am on that jury." It was further averred in the motion that upon his voir dire examination the juror stated that he had formed no opinion that would influence a verdict if selected as

a juror. Upon a hearing, Cecil Davis testified that he heard the juror say to another man while he was standing on the courthouse steps that he had been summoned for jury service in a case in which a negro was charged with raping a white woman, and that he knew what he would do if left to him; that when he got through with the negro they would not be able to find a piece of him anywhere. The witness testified that he did not advise appellant or his counsel of the matter until after the jury had rendered a verdict, but did state to a party who was sitting by him in the court room that the juror should not have answered on his voir dire examination that he had not formed any opinion as he had heard him say prior to his examination that he had formed an opinion. This witness admitted that he was voluntarily engaged in raising money in an endeavor to aid appellant in an effort to secure a new trial. He had gone to the office of appellant's attorney and told him to prepare an instrument to be used in securing money as he had lots of friends among his church people who would subscribe to aid appellant in securing a new trial. He testified further that he had secured offerings from various people and had promise of further contributions. He said that he attended appellant's trial. The juror to whom the statement was attributed testified that he talked to a Mr. Zapp and Mr. Stading while he was standing on the courthouse steps waiting his turn to be called as a juror; that he told the parties to whom he was talking that he had been summoned for jury service and that if he served on the jury he would give appellant a fair trial; that he would not take the life of the accused without giving him a fair trial; that he said further to them that he had formed no opinion as to the guilt or innocence of appellant; that he did not state what he thought about the case and no question was asked him about the matter; that he told said parties that the fact that appellant was a negro would not be taken into consideration by him at all. The juror also testified that at the request of appellant's attorney he had gone to his office after the trial and that appellant's attorney had asked him if he made the remark before the trial "I know what I would do if I get on the jury." He said he told appellant's counsel that he did not think he had used those words, but that if he did he meant that if he got on the jury he would give appellant a fair trial. We quote the testimony of the juror at this point as follows: "I told you that I did not remember the exact words I said. I said 'All I can tell you is the frame of mind I was in, and from that frame of mind if I did use those particular words or terms of speech they meant just one thing. I knew what I would do if I got on the jury—that I would give that man a fair trial.' * * * That remark about there would not be any pieces left of him, or anything to that effect is entirely new. I never heard that before. I never heard the remark 'I know what I would do with him if left to me. When I got through with him you

could not find a piece of him.' Mr. Phipps did not say anything about that at all to me. I did not make any such remark, as far as I remember to Mr. Stading or anyone else on the courthouse steps, nothing in that trend at all. The answers I made on the voir dire examination reflected my frame of mind at that time beyond the shadow of a doubt."

In an inquiry of this kind the law vests in the trial judge the discretion to determine the issues upon which the evidence is conflicting. The trial court may disregard testimony of witnesses who are interested or impeached. Davis v. State, 101 Texas Crim. Rep., 352, 275 S. W., 1029. That the trial court had broad discretion in determining the truth or falsity of an averment in the motion for new trial is well settled. The witness Cecil Davis was admittedly interested in the outcome of appellant's case. He had voluntarily engaged himself in securing contributions to aid him in an effort to obtain a new trial. It was the province of the trial court to disregard the testimony of the witness because of his interest in the case. While it is true that the juror, in concluding his testimony, testified that he did not make the statement attributed to him "as far as he remembered," we find that in other parts of his testimony he declared emphatically the statement was entirely new to him. Moreover, he testified that in conversing about the matter he had declared that he had no opinion about the case and that he would give appellant a fair and impartial trial. We are unable to reach the conclusion that the learned trial judge abused the discretion vested in him in determining that the juror was unbiased.

In Branch's Annotated Texas Penal Code, section 565, page 288, we find the following statement: "When it is sought to show on the hearing of the motion for new trial that a juror before the trial had expressed an opinion of defendant's guilt or had made statements which showed a prejudice against defendant, the decision of the trial court on the issue will be sustained by the appellate court unless clearly wrong if the evidence bearing thereon was conflicting and was sufficient, if believed, to justify the action of the trial judge."

See Meadors v. State, 101 Texas Crim. Rep., 336, 275 S. W., 829, and McKenzie v. State (Texas Crim. App.), 11 S. W. (2d) 172.

In his motion for new trial appellant attempts to set up purported remarks alleged to have been used in argument by the prosecuting attorney. No objections to these remarks are brought forward in bills of exception. As presented, we are at a loss to understand just what happened. There being no bill of exception complaining of any argument, there is nothing before us in regard to such matter. This court has committed itself to the proposition that ordinarily objection to the argument must be made at the time it occurred in order that the attorney making may, if he sees fit, withdraw or explain it. Sears v. State, 106 Texas Crim. Rep., 219, 291 S. W., 547; Ross v. State (Texas Crim. App.), 7

S. W. (2d) 1078; Harris v. State, 93 Texas Crim. Rep., 544, 249 S. W., 485.

A careful examination of appellant's contentions leads us to the conclusion that error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.